Mayberry Appeal.

Argued November 12, 1968. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Peter Kanjorski,* for appellant.

*Charles B. Watkins,* Assistant District Attorney, with him *Robert W. Duggan,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE JONES, April 23, 1969:

Herbert Langnes, Dominic Codispoti and Richard Mayberry were indicted by the Grand Jury of Allegheny County on two charges: (1) holding hostages in a penal institution and (2) prison breach. All three defendants were tried together and all three defendants were found guilty on both counts.

Richard Mayberry entered a plea of not guilty, waived his right to representation by counsel and chose to act as his own counsel at trial.[1]

On December 12, 1966, the court sentenced Mayberry to a term of imprisonment of not less than fifteen or more than thirty years on the first count and not less than five or more than ten years on the second count. These sentences were to be served consecutively at the expiration of any sentence Mayberry was already serving.

On the same day the court also sentenced Mayberry on eleven separate acts of criminal contempt which allegedly took place during the trial of the case and imposed a sentence of not less than one or more than two years for each separate act of criminal contempt, said sentences to be served consecutively at the expiration of the sentences imposed for the two crimes of which he had been convicted. From these judgments on the contempt charges Mayberry has filed the instant appeals.[2]

Mayberry in his brief presents three contentions: (1) that he was denied the right to trial by jury on the contempt charges in violation of the Sixth and Fourteenth Amendments to the United States Constitution; (2) that he was denied due process of law by being convicted and sentenced for criminal contempt without procedural safeguards; (3) that he has been subjected to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the

[1] The court appointed a representative of the Public Defender's office to act as Mayberry's consultant during trial.

[2] On March 19, 1968, a judgment of non pros. was entered because of Mayberry's failure to file a brief, but on August 5, 1968, this Court removed the judgment of non pros. reinstated Mayberry's appeal and appointed counsel to represent him in these appeals. Both Mayberry and his counsel have each filed separate briefs on Mayberry's behalf.

United States Constitution in being sentenced to a minimum of eleven and a maximum of twenty-two years on the contempt charges. Mayberry's appointed counsel in his brief raises the following issues: (1) that the court erred in failing to provide Mayberry with substantive constitutional safeguards by not apprising him of the nature and elements of the crime of criminal contempt, by not giving timely notice of the commission of criminal contempt, by not informing him of his right to counsel and in failing to provide him with counsel at the time of sentence; (2) that the statute providing for criminal contempt is unconstitutional as applied to the instant factual situation.

The contempt charges grew out of Mayberry's conduct during the course of the trial where he acted as his own counsel. An examination of the record reveals a course of conduct on Mayberry's part almost beyond belief and of an obviously and patently planned and determined attempt on Mayberry's part to interfere with the administration of justice and to make a farce and mockery of his trial. Mayberry accused the trial judge of denying him a fair trial, called him a "hatchet man for the State" and a "dirty S. O. B.," stated he would not "be railroaded into any life sentence by any dirty tyrannical old dog like [the judge]," told the trial court "to keep [his] mouth shut," referred to the court as a "bum" and a "stumbling dog," accused the court of working for the prison authorities and of conducting a Spanish Inquisition. He further told the judge that he was in need of psychiatric treatment and was "some kind of nut." These few examples are indicative of Mayberry's outrageous conduct during the course of the trial. Moreover, in open court, Mayberry stated his intention of disrupting the court's charge to the jury and carried out his intention to such an extent that the court was finally forced to have him gagged, placed in a strait jacket and removed to an

adjoining courtroom to which the charge to the jury was broadcast through a public address system. The record further demonstrates beyond any question that Mayberry's behavior was calculated and planned with the aim of disrupting the orderly procedure of the trial and the administration of justice.

## Right to Trial by Jury

In *Duncan v. Louisiana*, 391 U.S. 145, 20 L. Ed. 2d 491 (1968), the United States Supreme Court held that the Constitution guaranteed the right to jury trial in serious criminal cases in state courts. In *Bloom v. Illinois*, 391 U.S. 194, 20 L. Ed. 2d 522 (1968), the Court was called upon to decide whether the Constitution guaranteed the right to a jury trial for a criminal contempt punished by a two-year prison sentence. Holding that "petty crimes need not be tried to a jury" and recognizing that the court had deemed it unnecessary under *Duncan* to fix "the exact location of the line between petty offenses and serious crimes," the court held that a criminal contempt punishable by a two-year prison sentence constitutes a serious crime which entitles a defendant to the right to trial by jury and that it is constitutional error to deny the defendant such right. If *Duncan* and *Bloom* are presently applicable, Mayberry would be entitled to a jury trial on the contempt charges.

However, the United States Supreme Court, in *De-Stefano v. Woods*, 392 U.S. 631, 20 L. Ed. 2d 1308 (1968), held that *Duncan* and *Bloom* "should receive only prospective application." Since *Duncan* and *Bloom* were decided in 1968 and since Mayberry's trial took place in December, 1966, the rulings in *Duncan* and *Bloom* do not apply to Mayberry, and Mayberry is not entitled to a trial by jury on the contempt charges.

## Denial of Due Process

The contempt charges upon which Mayberry was sentenced constituted *direct* criminal contempts which took place in open court in the presence of the court and the jury. Punishment for direct criminal contempt may be inflicted summarily. See: *Philadelphia Marine Trade Association v. International Longshoremen's Association*, 392 Pa. 500, 509, 140 A. 2d 814 (1958).[3]

The Act of June 16, 1836, P. L. 784, §23, 17 P.S. §2041, provides, inter alia, as follows: "The power of the several courts of this commonwealth to issue attachments and to inflict summary punishments for contempts of court shall be restricted to the following cases, to wit: . . .

"III. To the misbehavior of any person in the presence of the court, thereby obstructing the administration of justice." In a direct criminal contempt, the court has the inherent power to protect its judicial dignity and conscience and to protect itself from insult and abuse. See: *Aungst Contempt Case*, 411 Pa. 595, 192 A. 2d 723 (1963). Section 24 of the Act of 1836, supra, provides: "The punishment of imprisonment for contempt as aforesaid shall extend only to such contempts as shall be committed in open court, and all other contempts shall be punished by fine only." (17 P.S. §2042)

In *Weiss v. Jacobs*, 405 Pa. 390, 394, 395, 175 A. 2d 849 (1961), this Court said: "In In Re Oliver, 333 U.S. 257, at 275-276, the United States Supreme Court stated: 'due process of law, . . . requires that one charged with contempt of court be advised of the

---

[3] The Act of June 23, 1931, P. L. 925, §1, 17 P.S. §2047, provides for the due process requirements to which a defendant is entitled when charged with *indirect* criminal contempt.

charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf either by way of defense or explanation. *The narrow exception to these due process requirements includes only charges of misconduct, in open court, in the presence of the Judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the Court. . . . and where immediate punishment is essential to prevent "demoralization of the Court's authority" before the public.* If some essential elements of the offense are not personally observed by the Judge, . . . due process requires, . . . that the accused be accorded notice and a fair hearing. . . .' " (Emphasis added)

The instant contempt charges arose out of the misconduct and misbehavior of Mayberry before the court and all the actions and utterances upon which these contempt charges were based took place in front of the trial judge. Under such circumstances, the court had plenary power to punish summarily for such contumacious conduct. To hold otherwise would be to offend the inherent powers of a court, particularly when the misconduct and misbehavior were as outrageous as that of Mayberry in the instant case.

We find no evidence under the circumstances of a violation of the constitutional due process requirements so far as Mayberry is concerned.

### Did the Sentences Constitute Cruel and Unusual Punishment?

The court below imposed not one but eleven sentences, each based on a separate contemptuous act of Mayberry. Each sentence was for one to two years.

The instant record is replete with instance after instance of contumacious conduct on Mayberry's part. Moreover, it is evident beyond question that such conduct was not only in defiance of the court and its dignity but was planned with a view to disrupting the orderly process of the trial and preventing and obstructing the proper administration of justice.

Under the instant circumstances, we conclude that the imposition of eleven one-to-two year sentences is not cruel and unusual punishment.

We now consider the several contentions made by Mayberry's court-appointed appellate counsel in his separate brief on behalf of Mayberry.

### Whether the Court Erred in Failing To Advise Mayberry of the Nature and Elements of Criminal Contempt and That His Actions Amounted to Criminal Contempt

Mayberry's counsel urges that it was the duty of the trial judge to warn Mayberry during the trial if and whenever his conduct became contemptuous, relying on *Glasser v. United States*, 315 U.S. 60, 86 L. Ed. 680 (1942), *Ogren v. Rockford Star Printing Co.*, 288 Ill. 405, 123 N.E. 587 (1919), and *Sacher v. United States*, 343 U.S. 1, 96 L. Ed. 717 (1952). We find nothing in these authorities which mandated that the trial judge in the instant case should have on each and every occasion warned Mayberry of his contemptuous conduct. The language and actions of Mayberry, even though he is a layman, were of such a nature that he had every reason to know that his conduct was in contempt of court; moreover, it is evident from this record that Mayberry's conduct was part of a scheme and plan to disrupt and render chaotic the conduct of his trial. We see no reason, under the circumstances, why Mayberry on each and every occasion should have been

warned of that of which he must have been fully aware. He knew that his conduct was outrageous and he deliberately planned such a course of conduct.

We find no merit in this contention.

### Is the Act of 1836, Supra, Unconstitutional as Instantly Applied Because It Fails To Establish a Standard of Permissible Behavior and Because Its Terms Are Unclear and Indefinite?

We have carefully considered this contention of Mayberry's counsel and find it absolutely without merit.

The instant case presents an example of a person charged with a criminal offense who deliberately, consciously and intentionally enters upon his trial proposing to so obstruct, by his language and his actions, the orderly trial process in order to thwart the administration of justice. Such conduct cannot and should not be tolerated. To hold otherwise is to make a mockery of criminal trials and to render our courts subject to infamy and abuse.

While at first blush the totality of the sentences imposed might seem harsh, yet in view of Mayberry's conduct the severity of the sentences can be fully and completely justified. Mayberry was found guilty not only of criminal offenses but of having openly defied not only the court but the orderly process of law. As Mr. Justice JACKSON said in *Sacher v. United States*, supra (343 U.S. at 5) : "The nature of the deportment was not such as merely to offend personal sensitivities of the judge, but it prejudiced the expeditious, orderly and dispassionate conduct of the trial."

Judgments of sentence affirmed.

Mr. Justice COHEN and Mr. Justice EAGEN concur in the result.

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

As to appellant's claim that he was denied the right to a jury trial, I concur in the result reached by the majority solely on the ground that *Bloom v. Illinois,* 391 U.S. 194, 88 S. Ct. 1477 (1968), is not retroactive in application. See *DeStefano v. Woods,* 392 U.S. 631, 88 S. Ct. 2093 (1968).

---

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE O'BRIEN:

I agree with the majority that Mayberry was not entitled to a jury trial. Even if *Bloom v. Illinois,* 391 U.S. 194, 88 S. Ct. 1477 (1968), applies to direct criminal contempts as well as indirect criminal contempts, which question I find it unnecessary to consider, *Bloom* has been held not to be retroactive. *DeStefano v. Woods,* 392 U.S. 631, 88 S. Ct. 2093 (1968). I thus concur in the affirmance of the contempt conviction.

However, I must dissent from that portion of the majority opinion which upholds the sentence imposed on Mayberry. Although appellate courts are naturally reluctant to interfere with the sentencing procedure, a matter within the discretion of the trial court, this Court has a duty to consider whether that discretion has been abused. *Commonwealth v. Edwards,* 380 Pa. 52, 110 A. 2d 216 (1955). The duty is particularly crucial in direct criminal contempt cases where no statutory limit is placed upon the trial judge's discretion. *Brown v. United States,* 359 U.S. 41, 79 S. Ct. 539 (1959); *Green v. United States,* 356 U.S. 165, 78 S. Ct. 632 (1958).

I wish to emphasize that I hold no brief whatsoever for appellant's utterly deplorable conduct and I sympathize with the trial judge for the indignities both he and the judicial system were made to suffer as a result of appellant's conduct. Nonetheless, I believe

that the sentence imposed here exceeded all bounds of reasonableness. While the court below treated each of appellant's comments as a separate contempt and imposed eleven separate one to two year sentences to run consecutively, I think that a more realistic view of what occurred was that there was only one contempt—appellant's trial conduct as a whole—and that for this he was given a sentence of eleven to twenty-two years. Cf. *Yates v. United States*, 355 U.S. 66, 78 S. Ct. 128 (1957).

My research discloses no case in which the punishment meted out even approaches that here. The majority quotes, as support for the sentence here, from *Sacher v. United States*, 343 U.S. 1, 5, 72 S. Ct. 451 (1952): "The nature of the deportment was not such as merely to offend personal sensitivities of the judge, but it prejudiced the expeditious, orderly and dispassionate conduct of the trial." Yet those held in contempt in *Sacher* were sentenced only to terms of up to six month's imprisonment for a course of conduct that was as flagrant a defiance of the orderly processes of court as that involved here. Sacher and his fellows, *inter alia*: "Insinuated that there was connivance between the Court and the United States Attorney . . . Repeatedly made charges against the Court of bias, prejudice, corruption, and partiality . . . Made a succession of disrespectful, insolent, and sarcastic comments and remarks to the Court . . . [etc.]." *United States v. Sacher*, 182 F. 2d 416, 431 (2d Cir. 1950).

Although there is no doubt that the dignity of our courts must be upheld, by the contempt process, if necessary, in a Commonwealth where assault and battery is punishable by a maximum of two years' imprisonment, larceny by a maximum of five, voluntary manslaughter by a maximum of twelve, rape by a maximum of fifteen, and second-degree *murder* by a

maximum of twenty, a maximum sentence of twenty-two years for interference with the courtroom process and insults to the judge is cruel and unusual. I note that in Title Three of The Penal Code of 1939, entitled "Offenses against Public Justice and Administration", of the thirty-one crimes enumerated, only two—perjury (seven years) and prison breach (ten years) carry a maximum sentence of more than five years. No crime in the category carries with it a penalty approaching the twenty-two years given appellant, and I must dissent from the imposition of that sentence.

Commonwealth *v.* Willman, Appellant.

Argued January 8, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

490

*Vedder J. White*, with him *Will J. Schaaf*, for appellant.

*Richard F. Brabender*, Assistant District Attorney, with him *Michael M. Palmisano*, Assistant District Attorney, and *William E. Pfadt*, District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, June 27, 1969:

Appellant was arrested on July 13, 1963 on a charge of assault with intent to ravish. During the initial interrogation appellant was asked about a murder in a different case, committed in 1960, and appellant admitted that he had committed that crime. Appellant on July 13 and 14 gave several oral statements and a written confession admitting the murder. On July 18, appellant was taken to the Erie County Jail. On August 31, 1963, appellant gave another written confession. In the period between July 18 and August 31, appellant was questioned intermittently by police.

On January 17, 1964, after a pretrial suppression hearing, appellant's confessions were ruled admissible. On February 9, 1964, appellant was convicted by a jury of murder in the first degree and was sentenced to life imprisonment. No appeal was taken.

On May 2, 1968, appellant received post-conviction relief. The post-conviction court held the August 31 confession to have been involuntary and thus inadmissible and granted appellant a new trial. The July 13 and 14 statements and confessions of appellant were held voluntary and were admitted at appellant's retrial over objection. On September 23, 1968 a jury convicted appellant of murder in the second degree, appellant's motion for a new trial was denied, and appellant took this appeal.

Since it is conceded that appellant was not given the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966), before giving the confessions now at issue, appellant argues that those confessions were erroneously admitted at his second trial. Appellant contends that although his first trial took place before *Miranda,* his retrial took place after *Miranda* and thus in the second trial, the *Miranda* rules apply.

Appellant's contention has recently been rejected by the Supreme Court of the United States as a result compelled by the Constitution of the United States as interpreted in *Johnson v. New Jersey,* 384 U.S. 719, 86 S. Ct. 1772 (1966), the case which delineated the extent to which *Miranda* would apply. See *Jenkins v. Delaware,* 395 U.S. 213, 37 L.W. 4458 (1969). Although both *Johnson* and *Jenkins* permit us, as a matter of state law, to apply *Miranda* more broadly than would the Supreme Court of the United States we choose not to do so.

The opinion in *Jenkins* indicates that the Court in *Johnson* was attempting to strike a balance between the need for even-handed administration of justice and administrative burden placed on the law enforcement system by retroactive application. It is not altogether clear, even in light of this, why *Johnson* utilized a

date-of-trial test, rather than the date-of-occurrence test used subsequently in *Stovall v. Denno,* 388 U.S. 293, 87 S. Ct. 1967 (1967). It does seem, however, that the Court has wisely chosen in *Jenkins* to restrict to as great an extent as possible, within the limits of *Johnson,* the anomalous situation where the police are required to have given *Miranda* warnings before *Miranda* had been decided. Since the requirements of *Miranda* do not go to the validity of the guilt-determining process, it seems fair in striking the balance between individual rights and the administration of criminal justice to limit the retroactive application of the case. See generally Mishkin, Foreward: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56 (1965). This is especially true since the voluntariness test, considering the absence of *Miranda* warnings as a relevant factor, still provides a mechanism to guard against the infringement of individual liberties. See Comment, The Applicability of *Miranda* to Retrials, 116 U. Pa. L. Rev. 316, 326-27 (1967).

Appellant here indeed does claim that his confessions were involuntary. Although a hearing was held, and the confession declared voluntary in 1964, the court below correctly ruled that it was necessary to make a new determination of voluntariness under the "evolving" voluntariness test. See *Johnson v. New Jersey,* supra; *Davis v. North Carolina,* 384 U.S. 737, 86 S. Ct. 1761 (1966). Even under current standards of voluntariness, we believe that appellant's statements and confession of July 13-14 were properly introduced.

Appellant is concededly a mental defective, with I.Q. around 60. However there is no indication in the record that the police took unfair advantage of appellant's mental state, or coerced or imposed upon him

in any way. Appellant's questioning began around 10:30 p.m. on July 13, and the original hearing court found that appellant made his initial incriminating statements within 20 minutes of his arrest. He was then questioned until 3:30 a.m. on July 14, when he was given an opportunity to rest. Although appellant now claims that his quarters were inadequate, there is no indication that appellant was unable to sleep, or was at any time exhausted.

Questioning apparently did not recommence until after 1 p.m. on July 14. Appellant was questioned for several hours and was then taken before an alderman to be arraigned on the assault with intent to ravish charge. The murder was not mentioned at the arraignment. After the arraignment, questioning resumed and continued for about 3 1/2 hours until appellant signed a written statement at about 11:30 p.m.*

---

* After appellant gave his signed confession, he was kept in custody and periodically questioned until July 18, when he was taken to the County Jail. During this period, members of appellant's family asked to see him, but were told that appellant was to be given psychological and psychiatric examinations in order to determine the validity of his confession. It was felt that it would be wise to disturb appellant as little as possible during the pendency of these examinations, and appellant's family apparently agreed to not see him. There is no indication that appellant requested to see his family or that he knew that the family had accepted the police suggestion not to see him.

Although these actions by the police took place *after* appellant gave his confessions, and strictly speaking are not relevant to whether the confessions were voluntary, there is authority that at least where subsequent police conduct is sufficiently grievous, it is germane in determining police attitude in eliciting a prior confession. *Haley v. Ohio*, 332 U.S. 596, 600, 68 S. Ct. 302, 304 (1948) (Opinion of Mr. Justice Douglas, joined by three other Justices). Here, however, we can hardly say that the police showed that "callous attitude . . . towards the safeguards with respect for ordinary standards of human relationship [which] com-

---

pels that we take with a grain of salt their present apologia that the [interrogation] . . . was conducted in a fair and dispassionate manner." Id. Rather the police here seem to have been acting at least in part in appellant's own interest, and in no way treated him other than humanely.