## MAYBERRY v. PENNSYLVANIA

No. 121. Argued December 17, 1970—Decided January 20, 1971

Douglas, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, White, Marshall, and Blackmun, JJ., joined. Burger, C. J., post, p. 466, and Harlan, J., post, p. 469, filed concurring opinions. Black, J., filed a separate statement, post, p. 466.

*Curtis R. Reitz,* by appointment of the Court, 398 U. S. 902, argued the cause and filed a brief for petitioner.

*Carol Mary Los* argued the cause for respondent, *pro hac vice.* With her on the brief was *Robert W. Duggan.*

Mr. Justice Douglas delivered the opinion of the Court.

Petitioner and two codefendants were tried in a state court for prison breach and holding hostages in a penal institution. While they had appointed counsel as advisers, they represented themselves. The trial ended with a jury verdict of guilty of both charges on the 21st day, which was a Friday. The defendants were brought in for sentencing on the following Monday. Before imposing sentence on the verdicts the judge pronounced them guilty of criminal contempt. He found that petitioner had committed one or more contempts on 11 of the 21 days of trial and sentenced him to not less than one nor more than two years for each of the 11 contempts or a total of 11 to 22 years.

The Supreme Court of Pennsylvania affirmed by a divided vote. 434 Pa. 478, 255 A. 2d 131. The case is here on a petition for writ of certiorari. 397 U. S. 1020.

Petitioner's conduct at the trial comes as a shock to those raised in the Western tradition that considers a courtroom a hallowed place of quiet dignity as far removed as possible from the emotions of the street.

(1) On the first day of the trial petitioner came to the side bar to make suggestions and obtain rulings on trial procedures. Petitioner said: "It seems like the court has the intentions of railroading us" and moved to disqualify the judge. The motion was denied. Petitioner's other motions, including his request that the deputy sheriffs in the courtroom be dressed as civilians, were also denied. Then came the following colloquy:

> "Mr. Mayberry: I would like to have a fair trial of this case and like to be granted a fair trial under the Sixth Amendment.
>
> "The Court: You will get a fair trial.
>
> "Mr. Mayberry: It doesn't appear that I am going to get one the way you are overruling all our motions and that, and being like a hatchet man for the State.
>
> "The Court: This side bar is over.
>
> "Mr. Mayberry: Wait a minute, Your Honor.
>
> "The Court: It is over.
>
> "Mr. Mayberry: You dirty sonofabitch."

(2) The second episode took place on the eighth day of the trial. A codefendant was cross-examining a prison guard and the court sustained objections to certain questions:

> "Mr. Codispoti: Are you trying to protect the prison authorities, Your Honor? Is that your reason?
>
> "The Court: You are out of order, Mr. Codispoti. I don't want any outbursts like that again. This

is a court of justice. You don't know how to ask questions.

"Mr. Mayberry: Possibly Your Honor doesn't know how to rule on them.

"The Court: You keep quiet.

"Mr. Mayberry: You ought to be Gilbert and Sullivan the way you sustain the district attorney every time he objects to the questions.

"The Court: Are you through? When your time comes you can ask questions and not make speeches."

(3) The next charge stemmed from the examination of an inmate about a riot in prison in which petitioner apparently was implicated. There were many questions asked and many objections sustained. At one point the following outburst occurred:

"Mr. Mayberry: Now, I'm going to produce my defense in this case and not be railroaded into any life sentence by any dirty, tyrannical old dog like yourself.

"The Court: You may proceed with your questioning, Mr. Mayberry."

(4) The fourth charge grew out of an examination of another defense witness:

"By Mr. Mayberry:

"Q. I ask you, Mr. Nardi, is that area, the handball court, is it open to any prisoner who wants to play handball, who cares to go to that area to play handball?

"A. Yes.

"Q. Did you understand the prior question when I asked you if it was freely open and accessible area?

"The Court: He answered your question. Let's go on.

"Mr. Mayberry: I am asking him now if he understands——

"The Court: He answered it. Now, let's go on.

"Mr. Mayberry: I ask Your Honor to keep your mouth shut while I'm questioning my own witness. Will you do that for me?

"The Court: I wish you would do the same. Proceed with your questioning."

(5) The fifth charge relates to a protest which the defendants made that at the end of each trial day they were denied access to their legal documents—a condition which the trial judge shortly remedied. The following ensued:

"Mr. Mayberry: You're a judge first. What are you working for? The prison authorities, you bum?

"Mr. Livingston: I have a motion pending before Your Honor.

"The Court: I would suggest——

"Mr. Mayberry: Go to hell. I don't give a good God damn what you suggest, you stumbling dog."

Meanwhile one defendant told the judge if he did not get access to his papers at night he'd "blow your head off." Another defendant said he would not sit still and be "kowtowed and be railroaded into a life imprisonment." Then the following transpired:

"Mr. Mayberry: You started all this bullshit in the beginning.

"The Court: You keep quiet.

"Mr. Mayberry: Wait a minute.

"The Court: You keep quiet.

"Mr. Mayberry: I am my own counsel.

"The Court: You keep quiet.

"Mr. Mayberry. Are you going to gag me?

"The Court: Take these prisoners out of here. We will take a ten minute recess, members of the jury."

(6) The sixth episode happened when two of the defendants wanted to have some time to talk to a witness whom they had called. The two of them had had a heated exchange with the judge when the following happened:

"Mr. Mayberry: Just one moment, Your Honor.

"The Court: This is not your witness, Mr. Mayberry. Keep quiet.

"Mr. Mayberry: Oh, yes, he is my witness, too. He is my witness, also. Now, we are at the penitentiary and in seclusion. We can't talk to any of our witnesses prior to putting them on the stand like the District Attorney obviously has the opportunity, and as he obviously made use of the opportunity to talk to his witnesses. Now——

"The Court: Now, I have ruled, Mr. Mayberry.

"Mr. Mayberry: I don't care what you ruled. That is unimportant. The fact is——

"The Court: You will remain quiet, sir, and finish the examination of this witness.

"Mr. Mayberry: No, I won't be quiet while you try to deny me the right to a fair trial. The only way I will be quiet is if you have me gagged. Now, if you want to do that, that is up to you; but in the meantime I am going to say what I have to say. Now, we have the right to speak to our witnesses prior to putting them on the stand. This is an accepted fact of law. It is nothing new or unusual. Now, you are going to try to force us to have our witness testify to facts that he has only a hazy recollection of that happened back in 1965. Now, I believe we have the right to confer with our witness prior to putting him on the stand.

"The Court: Are you finished?

"Mr. Mayberry: I am finished.

"The Court: Proceed with your examination."

460

[black rectangle]

(7) The seventh charge grew out of an examination of a codefendant by petitioner. The following outburst took place:

"By Mr. Mayberry:

"Q. No. Don't state a conclusion because Gilbert is going to object and Sullivan will sustain. Give me facts. What leads you to say that?"

Later petitioner said:

"Mr. Mayberry: My witness isn't being in an inquisition, you know. This isn't the Spanish Inquisition."

Following other exchanges with the court, petitioner said:

"Mr. Mayberry: Now, just what do you call proper? I have asked questions, numerous questions and everyone you said is improper. I have asked questions that my adviser has given me, and I have repeated these questions verbatim as they came out of my adviser's mouth, and you said they are improper. Now just what do you consider proper?

"The Court: I am not here to educate you, Mr. Mayberry.

"Mr. Mayberry: No. I know you are not. But you're not here to railroad me into no life bit, either.

"Mr. Codispoti: To protect the record——

"The Court: Do you have any other questions to ask this witness?

"Mr. Mayberry: You need to have some kind of psychiatric treatment, I think. You're some kind of a nut. I know you're trying to do a good job for that Warden Maroney back there, but let's keep it looking decent anyway, you know. Don't make it so obvious, Your Honor."

(8) A codefendant was removed from the courtroom and when he returned petitioner asked for a severance.

"Mr. Mayberry: I have to ask for a severance.

"The Court: I have heard that before. It is denied again. Let's go on."

(Exception noted.)

"Mr. Mayberry: This is the craziest trial I have ever seen.

"The Court: You may call your next witness, Mr. Mayberry."

Petitioner wanted to call witnesses from the penitentiary whose names had not been submitted earlier and for whom no subpoenas were issued. The court restricted the witnesses to the list of those subpoenaed:

"Mr. Mayberry: Before I get to that I wish to have a ruling, and I don't care if it is contempt or whatever you want to call it, but I want a ruling for the record that I am being denied these witnesses that I asked for months before this trial ever began."

(9) The ninth charge arose out of a ruling by the court on a question concerning the availability of tools to prisoners in their cells.

"The Court: I have ruled on that, Mr. Mayberry. Now proceed with your questioning, and don't argue.

"Mr. Mayberry: You're arguing. I'm not arguing, not arguing with fools."

(10) The court near the end of the trial had petitioner ejected from the courtroom several times. The contempt charge was phrased as follows by the court:

"On December 7, 1966, you have created a despicable scene in refusing to continue calling your witnesses and in creating such consternation and uproar as to cause a termination of the trial."

462

(11) As the court prepared to charge the jury, petitioner said:

> "Before Your Honor begins the charge to the jury defendant Mayberry wishes to place his objection on the record to the charge and to the whole proceedings from now on, and he wishes to make it known to the Court now that he has no intention of remaining silent while the Court charges the jury, and that he is going to continually object to the charge of the Court to the jury throughout the entire charge, and he is not going to remain silent. He is going to disrupt the proceedings verbally throughout the entire charge of the Court, and also he is going to be objecting to being forced to terminate his defense before he was finished."

The court thereupon had petitioner removed from the courtroom and later returned gagged. But petitioner caused such a commotion under gag that the court had him removed to an adjacent room where a loudspeaker system made the courtroom proceedings audible. The court phrased this contempt charge as follows:

> "On December 9, 1966, you have constantly, boisterously, and insolently interrupted the Court during its attempts to charge the jury, thereby creating an atmosphere of utter confusion and chaos."

These brazen efforts to denounce, insult, and slander the court and to paralyze the trial are at war with the concept of justice under law. Laymen, foolishly trying to defend themselves, may understandably create awkward and embarrassing scenes. Yet that is not the character of the record revealed here. We have here downright insults of a trial judge, and tactics taken from street brawls and transported to the courtroom. This is conduct not "befitting an American courtroom," as we

said in *Illinois* v. *Allen*,* 397 U. S. 337, 346; and criminal contempt is one appropriate remedy. *Id.*, at 344–345.

As these separate acts or outbursts took place, the arsenal of authority described in *Allen* was available to the trial judge to keep order in the courtroom. He could, with propriety, have instantly acted, holding petitioner in contempt, or excluding him from the courtroom, or otherwise insulating his vulgarity from the courtroom. The Court noted in *Sacher* v. *United States,* 343 U. S. 1, 10, that, while instant action may be taken against a lawyer who is guilty of contempt, to pronounce him guilty of contempt is "not unlikely to prejudice his client." Those considerations are not pertinent here where petitioner undertook to represent himself. In *Sacher* the trial judge waited until the end of the trial to impose punishment for contempt, the Court saying:

> "If we were to hold that summary punishment can be imposed only instantly upon the event, it would be an incentive to pronounce, while smarting under the irritation of the contemptuous act, what should be a well-considered judgment. We think it less likely that unfair condemnation of counsel will occur if the more deliberate course be permitted."
> *Id.*, at 11.

Generalizations are difficult. Instant treatment of contempt where lawyers are involved may greatly prejudice their clients but it may be the only wise course where others are involved. Moreover, we do not say that the more vicious the attack on the judge the less qualified he is to act. A judge cannot be driven out of a case. Where, however, he does not act the instant the contempt is committed, but waits until the end of the

---

*Petitioner was sentenced for contempt December 12, 1966. The Pennsylvania Supreme Court affirmed on April 23, 1969. We decided *Illinois* v. *Allen* on March 31, 1970.

trial, on balance, it is generally wise where the marks of the unseemly conduct have left personal stings to ask a fellow judge to take his place. What Chief Justice Taft said in *Cooke* v. *United States,* 267 U. S. 517, 539, is relevant here:

> "The power of contempt which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court is most important and indispensable. But its exercise is a delicate one and care is needed to avoid arbitrary or oppressive conclusions. This rule of caution is more mandatory where the contempt charged has in it the element of personal criticism or attack upon the judge. The judge must banish the slightest personal impulse to reprisal, but he should not bend backward and injure the authority of the court by too great leniency. The substitution of another judge would avoid either tendency but it is not always possible. Of course where acts of contempt are palpably aggravated by a personal attack upon the judge in order to drive the judge out of the case for ulterior reasons, the scheme should not be permitted to succeed. But attempts of this kind are rare. All of such cases, however, present difficult questions for the judge. All we can say upon the whole matter is that where conditions do not make it impracticable, or where the delay may not injure public or private right, a judge called upon to act in a case of contempt by personal attack upon him, may, without flinching from his duty, properly ask that one of his fellow judges take his place."

We conclude that that course should have been followed here, as marked personal feelings were present on both sides.

Whether the trial be federal or state, the concern of due process is with the fair administration of justice. At times a judge has not been the image of "the impersonal authority of law" (*Offutt v. United States,* 348 U. S. 11, 17) but has become so "personally embroiled" with a lawyer in the trial as to make the judge unfit to sit in judgment on the contempt charge.

"The vital point is that in sitting in judgment on such a misbehaving lawyer the judge should not himself give vent to personal spleen or respond to a personal grievance. These are subtle matters, for they concern the ingredients of what constitutes justice. Therefore, justice must satisfy the appearance of justice." *Id.,* at 14.

*Offutt* does not fit this case, for the state judge in the instant controversy was not an activist seeking combat. Rather, he was the target of petitioner's insolence. Yet a judge, vilified as was this Pennsylvania judge, necessarily becomes embroiled in a running, bitter controversy. No one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication. *In re Murchison,* 349 U. S. 133, was a case where a judge acted under state law as a one-man grand jury and later tried witnesses for contempt who refused to answer questions propounded by the "judge-grand jury." We held that since the judge who sat as a one-man grand jury was part of the accusatory process he "cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused." *Id.,* at 137. "Fair trials are too important a part of our free society to let prosecuting judges be trial judges of the charges they prefer." *Ibid.*

It is, of course, not every attack on a judge that disqualifies him from sitting. In *Ungar v. Sarafite,* 376 U. S. 575, we ruled that a lawyer's challenge, though "disruptive, recalcitrant and disagreeable commentary," was still not "an insulting attack upon the integrity of the judge

carrying such potential for bias as to require disqualification." *Id.*, at 584. Many of the words leveled at the judge in the instant case were highly personal aspersions, even "fighting words"—"dirty sonofabitch," "dirty tyrannical old dog," "stumbling dog," and "fool." He was charged with running a Spanish Inquisition and told to "Go to hell" and "Keep your mouth shut." Insults of that kind are apt to strike "at the most vulnerable and human qualities of a judge's temperament." *Bloom* v. *Illinois*, 391 U. S. 194, 202.

Our conclusion is that by reason of the Due Process Clause of the Fourteenth Amendment a defendant in criminal contempt proceedings should be given a public trial before a judge other than the one reviled by the contemnor. See *In re Oliver*, 333 U. S. 257. In the present case that requirement can be satisfied only if the judgment of contempt is vacated so that on remand another judge, not bearing the sting of these slanderous remarks and having the impersonal authority of the law, sits in judgment on the conduct of petitioner as shown by the record.

*Vacated and remanded.*

MR. JUSTICE BLACK concurs in the judgment and with all the opinion except that part which indicates that the judge without a jury could have convicted Mayberry of contempt instantaneously with the outburst.

MR. CHIEF JUSTICE BURGER, concurring.

I concur in the Court's opinion and add these additional observations chiefly for emphasis. Certain aspects of the problem of maintaining in courtrooms the indispensable atmosphere of quiet orderliness are crucial. Without order and quiet, the adversary process must fail. Three factors should be noted: (1) as MR. JUSTICE DOUGLAS has said, the trial was conducted without the guidance af-

forded by MR. JUSTICE BLACK's opinion for the Court in *Illinois* v. *Allen,* 397 U. S. 337; (2) although the accused was afforded counsel at his trial he asserted a right to act as his own counsel and the court permitted him to do so; (3) we are not informed whether Pennsylvania has a statute covering obstruction of justice that would reach the conduct of the accused shown by this record.

### (1)

As the Court's opinion suggests, the standards of *Illinois* v.. *Allen, supra,* would have enabled the trial judge to remove the accused from the courtroom after his first outrageous actions and words, and to summarily punish him for contempt. The contempt power, however, is of limited utility in dealing with an incorrigible, a cunning psychopath, or an accused bent on frustrating the particular trial or undermining the processes of justice. For such as these, summary removal from the courtroom is the really effective remedy. Indeed it is one, as this case shows, where removal could well be a benefit to the accused in the sense that one episode of contemptuous conduct would be less likely to turn a jury against him than 11 episodes. As noted by MR. JUSTICE BLACK in *Illinois* v. *Allen,* and MR. JUSTICE DOUGLAS here,. a fixed rule to fit every situation is not feasible; plainly summary removal is the most salutary remedy in cases such as this.

### (2)

Here the accused was acting as his own counsel but had a court-appointed lawyer as well. This suggests the wisdom of the trial judge in having counsel remain in the case even in the limited role of a consultant. When a defendant refuses counsel, as he did here, or seeks to discharge him, a trial judge is well advised—as so many do— to have such "standby counsel" to perform all the serv-

468

ices a trained advocate would perform ordinarily by examination and cross-examination of witnesses, objecting to evidence and making closing argument. No circumstance that comes to mind allows an accused to interfere with the absolute right of a trial judge to have such "standby counsel" to protect the rights of accused persons "foolishly trying to defend themselves," as MR. JUSTICE DOUGLAS so aptly described it. In every trial there is more at stake than just the interests of the accused; the integrity of the process warrants a trial judge's exercising his discretion to have counsel participate in the defense even when rejected. A criminal trial is not a private matter; the public interest is so great that the presence and participation of counsel, even when opposed by the accused, is warranted in order to vindicate the process itself. The value of the precaution of having independent counsel, even if unwanted, is underscored by situations where the accused is removed from the courtroom under *Illinois* v. *Allen.* The presence of counsel familiar with the case would at the very least blunt Sixth Amendment claims, assuming they would have merit, when the accused has refused legal assistance and then brought about his own removal from the proceedings.

(3)

There are other means to cope with grave misconduct in the courtroom, whether that of the accused, his counsel, spectators, or others. Statutes defining obstruction of justice have long been in force in many States, with penalties measured in years of confinement. Such statutes, where available, are an obvious response to those who seek to frustrate a particular trial or undermine the processes of justice generally.

A review of this record warrants a closing comment on the exemplary patience of the trial judge under provo-

cation few human beings could accept with equanimity. Our holding that contempt cases with penalties of the magnitude imposed here should be heard by another judge does not reflect on his performance; it relates rather to a question of procedure.

Mr. Justice Harlan, concurring.

I concur in the judgment of reversal solely on the ground that these contempt convictions must be regarded as infected by the fact that the unprecedented long sentence of 22 years which they carried was imposed by a judge who himself had been the victim of petitioner's shockingly abusive conduct. That circumstance seems to me to deprive the contempt proceeding of the appearance of evenhanded justice which is at the core of due process. For this reason I think the contempt convictions must be set aside, leaving the State free to try the contempt specifications before another judge or to proceed otherwise against this petitioner.

It is unfortunate that this Court's decision in *Illinois v. Allen*, 397 U. S. 337 (1970), was not on the books at the time the criminal case against this petitioner was on trial. The courses which that decision lays open to trial judges for coping with outrageous courtroom tactics of the sort engaged in by this petitioner would doubtless have enabled Judge Fiok to deal with the petitioner in a manner that would have obviated the regrettable necessity for setting aside this contempt conviction.