359 A.2d 739
In the Matter of A. Benjamin JOHNSON, a member of the
Bar of the Commonwealth of Pennsylvania.

Supreme Court of Pennsylvania.

Argued April 1, 1976.

Decided July 6, 1976.

Joseph C. Spaulding, Timothy A. Crawford, Jack J. Levine, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Glenn S. Gitomer, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

We are asked, in this case, to review [1] the conviction of an attorney for contempt of court based upon remarks

---

1. We hear this direct appeal under authority of the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(5), 17 P.S. § 211.202(5) (Supp.1975).

made to the jury during the closing argument of a criminal trial. Appellant A. Benjamin Johnson represented Larry Howard at Howard's trial for murder and lesser included offenses. During closing argument, appellant made five statements which are the basis of his contempt conviction:

1. Appellant stated that he "found out the judge and the District Attorney had signals, where the District Attorney and the judge had a signal where when the judge didn't understand the question [objection by district attorney] where the District Attorney understood and the judge didn't understand it."

2. Appellant stated that he had not received a copy of a witness' statement which the district attorney claimed to have given him.

3. When the district attorney objected, saying that he had given appellant the statement, appellant said, "I have never seen a statement. I don't have to lie. I come from a good church family."

4. When the court said, "Mr. Johnson, the District Attorney says you have been given every statement," appellant stated, "I don't have to take his word, that's the whole point. The District Attorney says they gave me every statement that was taken. Maybe we don't believe him."

5. Finally, the court asked appellant how long his closing argument would be. Appellant responded, "I don't know how long I will be judge, I will speak as long as necessary."

A petition and rule to show cause why appellant should not be held in contempt of court containing the five statements was filed and granted on December 26, 1974, approximately four months after Howard's trial. At the hearing on the rule, held January 29, 1975, the Commonwealth offered into evidence authenticated portions of the trial transcript, the transcript of a hearing to correct

the notes of testimony, and the transcript of a conference held by the trial judge, the district attorney and appellant following closing arguments in Howard's trial. No testimony, other than that necessary to authenticate the transcripts, was offered or taken. Appellant demurred to the Commonwealth's case and offered no evidence of his own when the demurrer was overruled. The rule was made absolute on March 13, 1975, and appellant was sentenced to pay a $200 fine on March 21, 1975. Appellant appeals from the judgment of sentence.

Although appellant makes several arguments, we address only the sufficiency of the evidence to sustain the conviction. This necessarily involves a determination of the elements of the crime for which appellant was convicted.

The Commonwealth, appellant and the trial court, at the time of the hearing, all believed the prosecution to have proceeded under authority of subsection I of the Act of June 16, 1836, P.L. 784, § 23, 17 P.S. § 2041 (1962). That section, in its entirety, provides:

> "The power of the several courts of this commonwealth to issue attachments and to inflict summary punishments for contempts of court shall be restricted to the following cases, to-wit:
>
> "I. To the official misconduct of the officers of such courts respectively;
>
> "II. To disobedience or neglect by officers, parties, jurors or witnesses of or to the lawful process of the court;
>
> "III. To the misbehavior of any person in the presence of the court, thereby obstructing the administration of justice."

Although this Court has never addressed the scope of this statute, we believe that each of these subdivisions was intended by the Legislature to permit the punishment, by exercise of the contempt power, of a different

type of conduct. The distinction among the subsections is, then, to be made not by reference to the class of persons included within the subsection, but by reference to the conduct proscribed.[2]

Subsection I permits the courts of the Commonwealth to compel their officers properly to perform their ministerial duties. For example, sheriffs must serve process, court reporters must record and transcribe testimony and prothonotaries must receive, date and file documents. Misconduct of any of these prescribed duties, which are imposed upon the individual by virtue of the official position held, is made punishable by subsection I. There need be no formal order directing the individual to do an act nor does the misconduct have to be within the presence of the court. Subsection I authorizes the court to punish the misconduct of any of the day to day functions necessary to the administration of justice.

Subsection II permits a court to punish "disobedience or neglect" of its "lawful process." Parties must obey decrees and orders, witnesses must appear when subpoenaed, jurors must present themselves when called. There must be a formal order directed to a specific person or group of persons, but the refusal to comply need not occur in the court's presence. Subsection II permits the courts to compel compliance with formal orders necessary or resulting from the trial of lawsuits.

2. The United States courts have a similar statute, first adopted in 1831, which also distinguishes among types of conduct rather than persons included within each section. 18 U.S.C. § 401 (1969) provides:

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

"(1) Misbehavior of any person in its presence or so near as to obstruct the administration of justice;

"(2) Misbehavior of any of its officers in their official transactions;

"(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

See *Nye v. United States*, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172 (1941).

█ Finally, subsection III grants the court power to ensure that lawsuits will be heard in a manner conducive to the just and orderly resolution of the issues presented. Any conduct "in the presence of the court" which "obstructs the administration of justice" may be punished under this grant of power. The third subdivision requires no formal order, but rather incorporates an implicit standard of decorum within the presence of the court. The conduct involved in this case could only be punished by exercise of the contempt power granted under subsection III of the Act of June 16, 1836.[3]

█ Criminal contempt of court is a crime. In a prosecution for criminal contempt, the Commonwealth has the burden of proving every element of the crime beyond a reasonable doubt. See *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). To prove criminal contempt of court which may be acted upon under authority of subsection III of the Act of June 16, 1836, the Commonwealth must prove an improper intent,[4] an action and an obstruction of the administration of justice. In this case we believe that there has

---

**3.** The Commonwealth, in its brief before this Court, agrees:
"[T]he Commonwealth would concede that in instances of official misconduct by an attorney as an officer of the court committed during trial, it is incumbent not only to establish misbehavior but also an actual obstruction of the administration of justice as required by subsection 3 of the Act of June 16, 1836, P.L. 784, § 23, 17 P.S. § 2041."
See also American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge § 7.1 (1972).

**4.** Because we find that the Commonwealth has not shown an obstruction of the administration of justice, we do not address whether it also failed to prove the requisite improper intent. We note, however, that President Judge Jamieson, at the sentencing hearing, stated:
And whatever motivated you at the time, I am sure it wasn't essentially an evil motive; you weren't doing it just to be an evil person. You did it because you had a client who you were interested in protecting, and you didn't think you were getting a fair shake.

been no proof that appellant's action obstructed the administration of justice.

Cases finding an obstruction of the administration of justice, as evidenced by the affirmance of a conviction for contempt of court under subsection III, give some idea what is meant by the phrase. See, e. g., *Commonwealth v. Patterson*, 452 Pa. 457, 308 A.2d 90 (1973) (fighting with deputy sheriffs in courtroom after they stopped an unlawful attempt by criminal defendants to leave); *Commonwealth v. Snyder*, 443 Pa. 433, 275 A.2d 312 (1971) (defendant interrupted Commonwealth's closing argument, refused to agree to behave in an orderly manner); *Mayberry Appeal*, 434 Pa. 478, 255 A.2d 131 (1969), vacated on other grounds, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971) (defendant interrupted proceedings, called trial judge a "hatchet man for the State," "a dirty S.O.B.," and a "dirty tyranical old dog").

█ The term was defined somewhat more specifically in *Tenenbaum v. Caplan*, 454 Pa. 1, 4, 309 A.2d 428, 430 (1973):

"The statute [subsection III] requires that there be an obstruction of the administration of justice which is not present in this case. There was no interruption of the trial. There was no disruption of the proceedings. Under such circumstances, we cannot find that appellant's conduct obstructed the administration of justice."

As these cases indicate, for conduct to be an obstruction of the administration of justice, it must interfere with and disrupt the orderly process of a court.

In this case, the first remark, alleging signals between the trial judge and the district attorney, prompted an immediate curative instruction by the court that no signals had passed between it and the district attorney. The colloquy takes 19 lines in the record—7 lines comprising the

allegation, 5 lines of objection by the district attorney, 2 lines of response by appellant and 5 lines of instruction by the court. The entire incident could not have lasted more than a minute or two.

The next three statements all occur within 16 lines of the record—11 lines by appellant, 3 lines of objection by the district attorney and 2 lines of instruction by the court. Again, the entire incident could not have taken more than a moment or two.

The last statement occupies two lines in the record.

It is clear, then, that appellant did not disrupt or delay the proceedings in any improper way. He was delivering his closing argument. He made statements to which the district attorney objected, he responded to the objection and the trial court ruled and instructed the jury. The procedure was orderly, there was no argument concerning rulings, there was no attempt deliberately to disrupt the trial. All of the language used was courteous. There is no allegation or indication anywhere in the record that voices were raised. We find no obstruction of the administration of justice in the manner, place or time of delivery of these remarks.

The Commonwealth would have us find obstruction in the substance of appellant's remarks. It creates the following syllogism: (1) if these remarks had been made by a prosecutor any conviction obtained would have been reversed on appeal, (2) if it is improper for the Commonwealth to make such remarks it is improper for defense counsel to make them, (3) therefore, appellant obstructed justice and is guilty of contempt. This reasoning fails at step (3).

We cannot say whether the remarks, if made by a prosecutor, would result in reversal of a conviction. Such a determination would turn on the facts of the case, particularly with regard to whether the remarks were harmless in the context of the trial. Moreover, very few,

if any, prosecutors are held in contempt for arguments made to the jury which are ultimately held to have been prejudicial. There is a distinct difference between making an improper argument to the jury and obstructing the administration of justice. It would be chaotic if any mistake which resulted in reversal of a conviction led also to the conviction of contempt of court of the person who made the mistake. Under such a system the spirited advocates upon whom we rely to ferret out the truth [5] would be a memory, replaced by attorneys fearful of any miscue.

If the Commonwealth wished to show that the substance of appellant's remarks obstructed justice, it would have to show that they affected the process of trial in some way. Mere affront to the trial judge is not enough. As Mr. Justice Douglas stated:

"[T]he law of contempt is not made for the protection of judges who may be sensitive . . .. Judges are supposed to be men of fortitude, able to thrive in a hardy climate. Conceivably a campaign could be so managed and so aimed at the sensibilities of a particular judge and the matter pending before him as to cross the forbidden line. But the episodes we have here do not fall in that category."

*Craig v. Harney*, 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546 (1947).[6] Here it would take a showing

---

**5.** "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free."
*Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975).

**6.** The contempt power of a trial judge is to be used to defend the orderly administration of justice. When conduct in the presence of the court threatens the administration of justice, it may be dealt with by means of the court's contempt power. Conduct which does not threaten the administration of justice, however, need not be tolerated. The offending party may be directed to cease his activities. Refusal to comply with such a direct order of the court would be punishable under subsection II of the Act

that the remarks prejudiced the proceedings in some way to show that they obstructed the administration of justice. In a jury trial, in which there was no disruption and no delay, no assault on the authority of the court, and no vituperative attack on the trial judge, obstruction of the administration of justice necessarily implies prejudicing the jury in its deliberations. The Commonwealth, at the January 29, 1975, hearing introduced no evidence to show that the jury was prejudiced by appellant's remarks. The remarks themselves, referring to factual matters which took place during the trial and in the presence of the jury, are not such that we will create a presumption of improper influence. We are unwilling otherwise to speculate concerning the existence of an element of the crime charged.

In order to show a contempt of court punishable under subsection III of the Act of June 16, 1836, the Commonwealth had to show an obstruction of the administration of justice. It has failed to do so. Appellant's claim that the evidence introduced at the hearing was insufficient to sustain the conviction must, therefore, be sustained.

Judgment of sentence reversed.

POMEROY, J., filed a dissenting opinion in which JONES, C. J., and EAGEN, J., joined.

POMEROY, Justice (dissenting).

During the course of his closing argument to the jury, appellant, A. Benjamin Johnson, Esquire, accused the trial judge of acting in collusion with the assistant district attorney, accused the assistant district attorney of withholding evidence, injected his own credibility as well as that of the assistant district attorney into the case, and rudely responded to the trial judge's attempt to as-

of June 16, 1836. Moreover, if the offending party is an attorney, he may be subject to professional discipline. But the contempt power of the court is restricted to defense of the process, not the man wielding the power.

certain how long Mr. Johnson's already lengthy summation would continue. On the basis of these comments and in accordance with the statutory authorization set forth in subsection I of the Act of July 16, 1836, P.L. 784, § 23, 17 P.S. § 2041 (1962) [hereinafter "subsection I" or "the Act of 1836"], appellant was adjudged in contempt of court. The Court today (1) concludes that subsection I does not authorize a court to hold in contempt a lawyer whose misconduct during trial brings the authority of the court into disrespect; (2) holds instead that such conduct may be punished, if at all, only under the standards set forth in subsection III of the Act of 1836; and (3) decides that the challenged comments of appellant may not properly be punished under that subsection. Because I believe that the majority has misconstrued subsection I, has misapplied subsection III and has reached an incorrect result, I am compelled to dissent.

The Act of 1836 serves as a restriction on the inherent power of the courts to uphold the dignity and authority of their proceedings through punishments for contempt. *Snyder's Case,* 301 Pa. 276, 284, 152 A. 33 (1930). See also *Appeal of Levine,* 372 Pa. 612, 95 A.2d 222, *cert. denied* 346 U.S. 858, 74 S.Ct. 72, 98 L.Ed. 371 (1953); *Schlesinger v. Musmanno,* 367 Pa. 476, 81 A.2d 316 (1951). The language of the Act does not purport to grant to courts a new power, but rather acts to restrict the power courts inherently possess:

> The power of the several courts of this commonwealth . . . *shall be restricted* to the following cases . . . . .

Any construction of the Act must be undertaken with this in mind.

## I

Subsection I of the Act restricts the contempt power of the courts to instances of "official misconduct of officers

of such courts respectively." The majority construes this language as permitting courts "to compel their officers properly to perform their ministerial duties. For example, sheriffs must serve process, court reporters must record and transcribe testimony and prothonotaries must receive, date and file documents." Opinion of the Court, *ante* at 741.[1] Presumably because a lawyer does not engage in ministerial duties when he tries a case before a court, courtroom misconduct by a lawyer may not, in the majority's view, properly be punished under this subsection.

This construction, however, ignores the fundamental relationship which exists between a lawyer and the court and is in derogation of the historical power of the court to regulate that relationship. See *e. g., McLaughlin v. Philadelphia Newspapers, Inc.*, 465 Pa. 104, 348 A.2d 376, 380 (1975); *Office of Disciplinary Counsel v. Campbell*, 463 Pa. 472, 345 A.2d 616, 679 (1975); *In re Shigon*, 462 Pa. 13, 329 A.2d 235, 241 (1974); *In re Schofield*, 362 Pa. 201, 204 n. 1, 66 A.2d 675, 677 n. 1 (1949). In my view, the restrictions of the Act of 1836 were never intended to alter the inherent power of a court to supervise the conduct of a lawyer who appears before it.

It is axiomatic that lawyers "are officers of the court admitted to office on taking the statutory oath, *inter alia*, to behave 'with all good fidelity' to the court as well as to the client." *In re Schofield, supra*; *Scouten's Appeal*, 186 Pa. 270, 279, 40 A. 481 (1897). *See also* Preamble to The Rules of Disciplinary Enforcement, Rule 17 of The Rules of the Supreme Court of Pennsylvania, adopted March 21, 1972, effective July 1, 1972, 446 Pa. xxiii (1972) (later extended to November 1, 1972); ABA Special Committee on Evaluation of Disci-

---

1. I intimate no view as to whether sheriffs, court reporters and prothonotaries are officers of the court within the meaning of subsection I of the Act of 1836.

plinary Enforcement, Problems and Recommendations in Disciplinary Enforcement, 11 (1970). Among the responsibilities owed to the court by a lawyer is the duty to refrain from "[engaging] in undignified or discourteous conduct which is degrading to the tribunal." Code of Professional Responsibility, DR 7–106(6), 42 Pa.C.S. Indeed "[a]s an officer of the court the lawyer should support the authority of the court and the dignity of the trial courtroom by strict adherence to the rules of decorum and by manifesting an attitude of professional respect towards the judge, opposing counsel, witnesses and jurors." ABA Standards, The Defense Function § 7.-1(a) (1971). When a lawyer consciously departs from these standards he engages in official misconduct which, in my view, is punishable by contempt under subsection I of the Act of 1836.[2]

## II

Furthermore, even were I to adopt the reasoning of the majority that the conduct in question is punishable only under subsection III of the Act of 1836, I still could not subscribe to the analysis employed by the Court in its application of that subsection to the facts of this case.

The majority concludes that appellant's conviction must be reversed because the Commonwealth has failed to prove that appellant's actions "obstructed the administration of justice" within the meaning of subsection III.

---

**2.** That such conduct may be punished by disciplinary sanction pursuant to the Rules of Disciplinary Enforcement, see Rule 17–3 of the Rules of The Supreme Court of Pennsylvania, does not preclude punishment of the same conduct through the power of contempt. As Rule 17–1 of the Rules of the Supreme Court expressly states:

"Nothing herein contained shall be construed to deny to any other court such powers as are necessary for that court to maintain control over proceedings conducted before it, such as the power of contempt, nor to prohibit bar associations from censuring, suspending or expelling their members from membership in the association."

See also In re Schofield, 362 Pa. 201, 214, 66 A.2d 675, 682 (1949).

This conclusion is said to follow from cases which have given meaning to that phrase. This meaning is gathered from four of our cases which, significantly, do not involve lawyer misconduct; rather, they are cases dealing with belligerent defendants and arrogant witnesses. This standard for lay obstruction is then superimposed upon the actions of appellant and the conclusion is reached that, so measured, appellant's conduct is not punishable under subsection III. In this superimposition, however, the majority ignores the fact that a lawyer appears before a court in a somewhat different posture than does a lay person and that his actions must, in consequence, be judged by a different standard. *See, e. g.,* N. Dorsen and L. Friedman, Disorder in the Court, Report of the Association of the Bar of the City of New York, 158 (1973).

Unlike the lay person, the lawyer is duty bound to manifest an attitude of professional respect toward the court and its processes. His conduct in the courtroom can have a great impact on the extent to which the proceedings are perceived as fair and dignified by juror, defendant, witness, and spectator. He possesses the unique capability of denigrating the proceedings through eloquently clothed charges of impropriety. Unlike the lay person, he can obstruct justice without being overtly belligerent and without taking up a great deal of the court's time. His carefully chosen words, softly spoken and briefly put though they may be, can submerge the dignity of the proceedings in insinuations of improprieties. The impact of the lawyer's action must, therefore, be assessed in the light of these considerations.

### III

With these thoughts in mind I turn now to the merits of this case. It is my view that the comments of appellant constituted official misconduct within the meaning of subsection I of the Act of 1836 and impermissibly ob-

structed justice within the meaning of subsection III of the Act. Accordingly I would affirm the appellant's conviction for contempt.

In the course of his summation appellant brought to the jury's attention that "he had found out the judge and the assistant district attorney had signals, where when the judge didn't understand the question [objection by assistant district attorney] . . . where the assistant district attorney understood and the judge didn't understand it." This accusation was not inadvertently uttered in the heat of a zealous assertion of the position of the defense. Rather it was a calculated charge of misconduct which appellant deliberately chose to argue to the jury as a factor to be weighed in its deliberation of the case. So much is clear from a review of the record.[3]

From my review of the record I am convinced that appellant honestly believed that the trial judge had acted in

---

**3.** Following his closing argument appellant explained his conduct to the trial judge in Chambers thusly:

"Therefore, Mr. Strauss [the assistant District Attorney] gave a signal that I wasn't aware—he knew what was in your mind, that you did not understand—and that's the reason he was doing that. That was something that you two would have to explain because it has never been explained satisfactorily to me.

"I still make the same statement. How Mr. Strauss knew you didn't understand, I don't know. Maybe it has something to do with my ethnic background. Maybe the two [of] you understand through some kind of radar signal.

"THE COURT: I don't understand Mr. Walker's dialect. Maybe you do. . . . When he said he rode around in a car, he said he 'rid' around in a car. Those things I don't know. . . .

"MR. JOHNSON: The fact is, if you did not understand, what you should have done, as the Judge presiding at the trial, because maybe the jury doesn't understand, you should say, 'Speak plainer.' That's different from letting Strauss say, 'When you say you rid around you mean you did such and such?' Mr. Strauss can't do that. The witness must give answers.

"THE COURT: This is not the first time you have instructed me on how to try a case.

"MR. JOHNSON: I am not instructing you. You asked me a question. I am answering the question. I think I have a duty and obligation to make some statement in front of the jury."

collusion with the assistant district attorney during the course of the trial. His decision to argue this perceived impropriety to the jury was, however, manifestly improper. The proper forum for arguing allegations of judicial improprieties is the appellate courts.

"The obligation of the lawyer to maintain a respectful attitude toward the court is 'not for the sake of the temporary incumbent of the judicial office,' but to give due recognition to the position held by the judge in the administration of the law. ABA Canons of Professional Ethics No. 1 (1968). The lawyer, by his attitude, communicates to the laymen in the courtroom the professional relation which exists between judge and lawyer. The appropriate way to challenge the judge's decisions is through appropriate procedural devices, including objections and appeals designed for that purpose, not by seeking to impress the client by a show of belligerency which exceeds the need to make a record of what he believes is error in the case. A restrained, respectful attitude on the part of each advocate toward the other helps reinforce the concept that the adversary system, although based on contention, is a mechanism which depends upon evidence and the rule of law, not vituperation or personalities. See, e. g., *In re Schofield*, 362 Pa. 201, 66 A.2d 675 (1949); Drinker, Legal Ethics 69–70 (1953).

"ABA Standards, The Defense Function § 7.1 at 258 (Commentary) (Tentative Draft 1970)."

By choosing instead to argue these allegations to the jury, appellant impermissibly injected the impartiality of the trial judge as an issue in the case. By so doing he violated his official duty to the court and obstructed the proper administration of the trial. As three members of this Court have recently observed:

" . . . the remarks which appellant made to the jury during his closing argument clearly 'tended to bring the authority and administration of the law into

disrespect,' and were therefore properly punished by the contempt order before us. These remarks called into question the fairness of the trial proceedings and were calculated to appeal to the jury, not on the basis of the evidence presented, but on the purported unfairness of the trial they had witnessed. Arguments to the jury based upon such an indictment of the trial proceedings are, in my mind, manifestly improper and cannot be said to fall within the scope of a lawyer's duty zealously to represent his client. A lawyer must, of course, vigorously pursue appropriate procedures to challenge errors in the proceedings; but to say that a lawyer must not allow perceived error to go uncontested is not to condone the misguided effort to argue the wisdom of the judge's rulings to the jury." *Commonwealth v. Cherry*, 467 Pa. 160, ——, 354 A.2d 894, 895 (opinion in support of affirmance by Pomeroy, J., joined by Jones, C. J., and Eagen, J.).

The majority, however, argues the proposition that "[m]ere affront to the trial judge is not enough" to support a contempt conviction. Opinion of the Court *ante* at 743. This proposition is said to be derived from the quoted language of the Supreme Court of the United States in *Craig v. Harney*, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1946). The *Craig* decision, however, is simply not apposite to the circumstances of this case. In *Craig* the Supreme Court was called upon to decide the extent to which the press could be punished for contempt for critical journalistic appraisals of a trial judge's handling of a case then before the court. It was in this context that the language relied upon by the majority was written.

It is certainly undeniable that judges should not be allowed to use the power of contempt simply to silence discomforting criticism by the press. In this sense they must, in Mr. Justice Douglas' words, be "men of fortitude, able to thrive in a hardy climate." [Opinion of the

Court *ante* at 743. The broad protections of the First Amendment require at least this much. But to say that a judge may not wield the contempt power to throttle public criticism by the press is not to condone similar criticism of a judge uttered by a lawyer during the course of a courtroom proceeding. Citicism by the press is in the nature of public debate: it protects the integrity of the court by exposing its processes to robust public review. Accusations of judicial impropriety made by a lawyer to a jury in the course of a judicial proceeding, however, serves only to denigrate the authority and dignity of the court. To preserve the integrity of our courts judges must accept the former types of criticism but must not tolerate the latter. For these reasons, I would affirm appellant's contempt conviction.

JONES, C. J., and EAGEN, J., join in this dissenting opinion.