In the Matter of Edward J. DeSaulnier, Jr.
& another (No. 3).

Suffolk. — December 15, 1971.

Present: Tauro, C.J., Cutter, Reardon, Quirico, & Braucher, JJ.

*Contempt. Constitutional Law,* Trial by jury, Contempt proceeding.
*Practice, Criminal,* Jury trial, Contempt proceeding.

Unconditional sentences for contempts imposed by this court on a
witness during orderly hearings of record on informations relating
to the conduct of one or both of two judges, for the witness's
undisputed separate refusals in open court to obey the court's
separate orders to answer each question put by its special counsel,
were intended to vindicate the authority of the court and to punish
the witness and were in large part for specified criminal contempts
of court [772-773]; the contempts were not serious enough to
demand an actual penalty for each contempt of more than six
months imprisonment, and constituted petty offences for which the
witness had no right to a jury trial under the Federal Constitution
[773-775, 777].

Under Massachusetts State law, there is no right to a trial by jury in a
proceeding for contempt committed in the presence of the court,
even when the proceeding's object and result are wholly punitive.
[773]

At hearings by this court of informations relating to the conduct of
one or both of two judges, where a witness in open court refused
separately to obey the court's separate orders to answer each
question put by its special counsel, and the witness declined to
answer when the special counsel asked whether he was "going to
refuse to answer any and all questions," and the witness made no
effort to carve out "an area of refusal," and no question put by
special counsel was repetitive and each sought to elicit new facts, it
was held that each of the witness's refusals to answer constituted a
separate contempt, and the court adjudged the witness to be in
contempt for each refusal and imposed a sentence for each
contempt [777, 779-780]; however, for sentencing purposes the
court separated the questions into five groups, each question in
each group relating to the same general subject as the other
questions in that group, and each group relating to a different

period of time or to a different set of incidents, and imposed on the witness consecutive sentences to the common jail, five months with respect to the first group and six months with respect to each of the remaining four groups [777–779].

*Monroe L. Inker* for I. Charles Baker.

*Edward B. Hanify & John M. Harrington, Jr.,* Special Counsel.

BY THE COURT. On November 29, 1971, the Supreme Judicial Court (this court) made certain findings and rulings of law regarding the refusal of the witness I. Charles Baker to answer questions put to him by special counsel, and denied Baker's attempt to assert a general claim of privilege in advance of being questioned. Special counsel then asked Baker a series of thirty-five questions (attached hereto as Exhibit A), each of which he declined to answer, "relying on the Fourth and Fifth Amendments to the Constitution of the United States." After each refusal to answer, the court ordered Baker to answer, eliciting only the same refusal. The court adjudged Baker to be in contempt for each refusal to answer, and reserved sentence. At the end of the day's proceedings, the court sentenced Baker to serve five months in the common jail for failure to answer each of questions 1, 3–12, and 22 (Group I). The twelve sentences were to be served concurrently. On each of the other contempts, the court deferred sentencing until December 1, 1971.

On December 1, 1971, prior to sentencing by this court, the United States Court of Appeals, First Circuit, affirmed the action of a Federal District Court judge who rejected Baker's request to be released on bail. The Court of Appeals stated that it saw "no substantial merit in [the] petitioner's attempt to challenge the Commonwealth's grant of immunity that would remove the danger of self-incrimination," and concluded that his "request for transactional immunity as to certain complaints brought against him for larceny committed in 1968 from his employer seems but a blatant attempt to horse-trade the Commonwealth." *Baker*

v. *Eisenstadt*, Misc. No. 540, U. S. Ct. App. (1st Cir.) 1, 2, 3.

On December 1, 1971, following argument by Baker's counsel, who made it clear to this court that he and his client were fully aware of the action and opinion of the United States Court of Appeals, First Circuit, this court stated that "if Mr. Baker wants to testify . . . he is at liberty to do so as of now. We have not ended the hearing." Counsel for Baker indicated that his client still intended to stand on his claim of privilege. The court then, as to each of four specific groups of questions, imposed six months concurrent sentences to be served in the common jail because of Baker's refusals to answer each of the questions in that group. Each of the following questions fell into one of these four groups: 13, 14, 16, 17, 21, 23, 24, 25, 26, 28, 29, 30, 31, 32, 18, 19, 20, 27, 37, 39, 33, 34 and 35. The sentences imposed were to be served as follows:

GROUP II:
> on each of the contempts on questions 13 and 14, concurrently with each other, and from and after the sentences for contempt imposed on November 29, 1971.

GROUP III:
> on each of the contempts on questions 16, 17, 21, 23, 24, 25, 26, 28, 29, 30, 31 and 32, concurrently with each other, and from and after the sentences for contempt imposed for Group II.

GROUP IV:
> on each of the contempts on questions 18, 19, 20, 27, 37 and 39, concurrently with each other, and from and after the sentences imposed for Group III.

GROUP V:
> on each of the contempts on questions 33, 34 and 35, concurrently with each other, and from and after the sentences imposed for Group IV. (See Exhibit A.)

Counsel at that point in effect moved for a jury trial for his client, which this court denied. The court then ordered the hearing closed "unless otherwise ordered by this Court on its own motion or on motion of counsel."

1. Massachusetts law has long refused to distinguish rigidly between the civil and criminal aspects of contempt of court. *McCann* v. *Randall*, 147 Mass. 81, 90. *New York Cent. R.R.* v. *Ayer*, 253 Mass. 122, 129. *Root* v. *MacDonald*, 260 Mass. 344, 357–358. *Stow* v. *Marinelli*, 352 Mass. 738, 745. Reed, Equity Pleading & Practice, § 971, 292–293. A sentence for contempt in Massachusetts may be "partly remedial and partly punitive, partaking both of civil and criminal features." *Root* v. *MacDonald*, *supra*, 363–365. *Stow* v. *Marinelli*, *supra*, 745. Nothing, however, precludes a Massachusetts court from giving an unconditional sentence for contempt which is largely or entirely "for the purpose of inflicting punishment upon one who has wilfully disobeyed a lawful order of the court," *McCann* v. *Randall*, 147 Mass. 81, 90, where this is necessary to vindicate the authority of the court and to deter other like derelictions, *Root* v. *MacDonald*, *supra*, *Stow* v. *Marinelli*, *supra*, 745, *Ex parte Grossman*, 267 U. S. 87, 111, or where the acts of the contemnor are an affront to the law tending to obstruct or degrade the administration of justice. *Cartwright's Case*, 114 Mass. 230, 238. *Godard* v. *Babson-Dow Mfg. Co.* 319 Mass. 345, 347. To the extent that such a contempt sentence is for purely punitive purposes and is absolute, not conditional, in nature it constitutes a sentence for criminal contempt. See *Hurley* v. *Commonwealth*, 188 Mass. 443, 447; *Blankenburg* v. *Commonwealth*, 260 Mass. 369, 372; *Opinion of the Justices*, 301 Mass. 615, 618–619; *Corcoran* v. *Commonwealth*, 335 Mass. 29, 35. This is in accord with the Federal law. See *Shillitani* v. *United States*, 384 U. S. 364, 369–370.

The sentences imposed on Baker for contempt of court were unconditional in terms. They were for the purpose of vindicating the authority of the court and punishing the contemnor for obstructing and degrading the administra-

tion of justice in an extraordinary proceeding of utmost importance to the State judicial system. His sentences were imposed, at least in large part, for specified criminal contempts of court. He does not have "the keys of . . . [his] prison in . . . [his] own pockets." See *Shillitani* v. *United States, supra*, 368; *In re Nevitt*, 117 Fed. 448, 461 (8th Cir.). We are not now required to discuss the authority of this court, in its discretion, with respect to the sentences already imposed in the event that Baker makes full disclosure.

2. In a proceeding for contempt, there is no right to a trial by jury under Massachusetts State law, even when the proceeding's object and result are wholly punitive. *Root* v. *MacDonald*, 260 Mass. 344, 365. *Dolan* v. *Commonwealth*, 304 Mass. 325, 340. *Commonwealth* v. *McHugh*, 326 Mass. 249, 277. See *Cartwright's Case*, 114 Mass. 230, 238; *Walton Lunch Co.* v. *Kearney*, 236 Mass. 310, 317; *Blankenburg* v. *Commonwealth*, 260 Mass. 369, 373–374; *Opinion of the Justices*, 349 Mass. 786, 793. General Laws c. 220, § 13A, which provides for a jury trial in contempt proceedings growing out of labor disputes, specifically excludes any "contempts committed in the presence of the court."

3. In *United States* v. *Barnett*, 376 U. S. 681, 692, Mr. Justice Clark, speaking for the court, said, "It has always been the law of the land, both state and federal, that the courts — except where specifically precluded by statute — have the power to proceed summarily in contempt matters." This case ruled that there was no general right to a jury trial in criminal contempt proceedings, pp. 692–700, although some members of the court were of the view that the Constitution limited the punishment which could be imposed where the contempt was tried without a jury. Pp. 694–695, note 12. The general rule has been reëxamined in light of the decision of the Supreme Court of the United States that the constitutional guaranty to jury trial extended to State courts in serious criminal cases. *Duncan* v. *Louisiana*, 391 U. S. 145, 149–150, 159.

In *Bloom* v. *Illinois*, 391 U. S. 194, 195, 210–211, the Supreme Court held that where sentence by a State court for a single out-of-court criminal contempt reached twenty-four months imprisonment there was a right to a trial by jury. There was a short, but compelling, dissent by Mr. Justice Harlan, joined by Mr. Justice Stewart. P. 215.

We are, of course, bound by the reëxamination in the *Bloom* decision of the general rule stated in the *Barnett* case. The case before us, however, is very different, in both the letter and the spirit of the law involved, from that in the *Bloom* case. Baker was guilty of a series of distinct contempts against the authority of this court, consisting of separate refusals to obey different orders of this court to answer questions. These the court separated into groups of questions, each question in each group relating to the same general subject as the other questions in that group. The refusal to answer the questions in no one of these groups was made the basis of a sentence of more than six months. The situation is entirely different from the single contempt in the *Bloom* case, where the contemnor wilfully sought to have admitted to probate a will falsely prepared and executed after the death of the putative testator, an act which was held to deserve a sentence of twenty-four months imprisonment. *Bloom* v. *Illinois*, *supra*, 195.

The *Bloom* case specifically declined to carry over the jury trial requirement to "petty" offences. *Dyke* v. *Taylor Implement Mfg. Co. Inc.* 391 U. S. 216, 219–220. See *Cheff* v. *Schnackenberg*, 384 U. S. 373, 380; *Baldwin* v. *New York*, 399 U. S. 66, 68–69. Mr. Justice White, speaking for the court in the *Bloom* case, said, "By deciding to treat criminal contempt like other crimes insofar as the right to jury trial is concerned, we similarly place it under the rule that petty crimes need not be tried to a jury. . . . Our analysis of *Barnett*, *supra*, and *Cheff* v. *Schnackenberg*, 384 U. S. 373, makes it clear that criminal contempt is not a crime of the sort that requires the right to jury trial regardless of the penalty involved. Under the rule in *Cheff*, when the legis-

lature has not expressed a judgment as to the seriousness of an offense by fixing a maximum penalty which may be imposed, we are to look to the penalty actually imposed as the best evidence of the seriousness of the offense." *Bloom* v. *Illinois, supra,* 210–211. *Frank* v. *United States,* 395 U. S. 147, 149. None of Baker's offences was serious enough to demand an actual penalty of more than six months. These constitute petty offences, *Dyke* v. *Taylor Implement Mfg. Co. Inc., supra,* 219–220, *Baldwin* v. *New York, supra,* 68–69, which do not demand a jury trial as a matter of constitutional right in either Federal or State courts.

There is also another distinction, particularly important with regard to jury trial, between the kind of contempt involved in the *Bloom* case and that before us. In the *Bloom* case, the essence of the criminal contempt took place outside of the court room. The crucial question was not whether the petitioner had wilfully petitioned to admit to probate the will in question, for of that fact there could have been little doubt, but whether the will had been falsely prepared and executed after the death of the putative testator. *Bloom* v. *Illinois, supra,* 195, 210–211. Remanding for a trial by jury in this case, involving an alleged event which occurred largely out of court and off the record, was a reasonable step for the *Bloom* court and one which protected a right which could have had some genuine content and value. *Bloom* v. *Illinois, supra,* 211. Such a right might also have some value if the contempt involved a court-room disorder where the facts of what occurred were in question and where the personality of the judge was sufficiently involved as to impair his objectivity as to what actually took place. Compare the facts of *Mayberry* v. *Pennsylvania,* 400 U. S. 455, 455–463.

In the instant case, however, the contempts were refusals, made in open court before this court during a proceeding of record, to obey the lawful orders of the court to answer questions. There is no dispute of fact as to whether the individual refusals took place. The in-court proceedings

were entirely orderly.[1] The contemnor was not punished for any out-of-court contempts.

There have been no Federal cases which have decided that a right to jury trial exists where the contempt punished occurred in an orderly court room in the absence of any genuine dispute as to the facts. Even in the *Mayberry* case, where sentences for in-court contempt of a disorderly nature were given by a State judge and amounted to not less than one year for each offence and totaled eleven to twenty-two years, *Mayberry* v. *Pennsylvania, supra*, 455, the Supreme Court did not discuss a jury trial requirement, but vacated and remanded for a public trial before another judge on grounds relating to the possibility of personal involvement by the judge. *Mayberry* v. *Pennsylvania, supra*, 466.[2]

Baker has not argued or even suggested the existence of issues of fact relating to the offence with which he is charged. Indeed it would be most difficult, in the circumstances of this case, to conceive any factual questions which require or warrant their submission to a jury for determination. A jury trial in these circumstances would be an exercise in futility. See *Leigh* v. *Rule*, 331 Mass. 664, 669.

To fetter the ability of State courts to protect themselves against contempt in proceedings, such as this one, of the utmost importance to the integrity of the State judicial system itself in the name of a guaranty which, if granted, would be practically void of any meaningful value must, in the words of Mr. Justice Harlan, be "in derogation of the

---

[1] A dictum in the *Bloom* case refused to make an exception to the jury requirement for "disorders in the courtroom" largely because of the adequacy of petty sentences to deal with such situations. *Bloom* v. *Illinois, supra*, 210. This dictum did not consider contempts which entailed no questions of fact and for which petty offence sentences might be inadequate. In the present case, however, petty offence sentences, of the kind recommended by the *Bloom* court for in-court contempts, were adequate. See *Bloom* v. *Illinois, supra*, 209–210.

[2] There was a concurring opinion by Mr. Justice Harlan solely on the basis that the unprecedented long sentence "infected" the contempt convictions. This opinion suggests another basis for constitutional review of contempt sentences far more meaningful, in instances such as the case at hand, than a jury trial guaranty.

central premise of our Constitution." *Bloom* v. *Illinois,*
*supra,* 215. Baker was not deprived of a Federal right to
a jury trial.

4. We next consider whether Baker committed one or
a number of contempts by his repeated refusals to answer
the questions put to him by special counsel. There are
no reported Massachusetts cases dealing with this issue to
which we can look for guidance. Two related principles
have been established in other jurisdictions:

1. Only one *penalty* for contempt can be imposed when
   separate questions are designed to establish but a
   single fact, or relate to but a single subject of inquiry.
   *United States* v. *Orman,* 207 F. 2d 148, 160 (3d Cir.
   1953) and cases cited;

2. When several questions cover more than a single sub-
   ject of inquiry, a single contempt is committed by
   refusal to answer where every question falls within the
   area of refusal established by the witness when asked
   the first question. *Yates* v. *United States,* 355 U. S.
   66, 71, 73 (witness refused to identify anyone as a
   Communist). *People* v. *Riela,* 7 N. Y. 2d 571, 576–
   578 (witness refused to answer any questions concern-
   ing the so called "Apalachin meeting").[3]

With respect to (1), each of Baker's refusals to answer
after being ordered to do so by the court constituted a
separate contempt. No question put by special counsel
was repetitive. Each sought to elicit new facts. For the
purpose of sentencing, however, this court divided the ques-
tions into broader subjects of inquiry. Group I contains
twelve questions, each dealing in some way with Baker's
involvements with Raymond in the fall of 1961 and the

---

[3] The *Orman* and the *Yates* cases laid down a rule applicable to the Federal
courts only, and, like the New York case, did not purport to establish a con-
stitutional rule binding on all State courts.

spring of 1962, particularly with respect to the court proceedings in the Superior Court in Middlesex County (Cambridge) and the First District Court of Northern Middlesex (Ayer). The sentences imposed on November 29, 1971, for the contempts within this group were concurrent. Our judgment of the proper penalty was not influenced by the fact that we found Baker guilty of twelve contemptuous acts, but by our feeling that a refusal to speak on this particular, definable subject matter merited five months in the common jail.. Compare *Yates* v. *United States,* 355 U. S. 66, 71, 75. The penalty would have been the same whether we viewed this as one contempt or twelve. It was not possible to categorize, however, until special counsel had exhausted his examination. We thus adopted the procedure of adjudging the witness in contempt for each separate refusal to answer, and reserving sentence until examination had been completed.

We postponed until December 1, 1971, sentence on the contempts (other than Group I) for which no sentence was imposed on November 29, for two principal reasons: (1) to afford Baker an opportunity to reconsider his position with respect to such other questions, and .(2) to examine such questions and group them appropriately for sentencing purposes.

With respect to the concurrent six month sentences within Groups II–V, we felt that consecutive, or "from and after" sentences should be imposed for failure to answer questions in each of the four groups. Baker had every opportunity to testify after *Baker* v. *Eisenstadt, supra,* was handed down and before the hearing was terminated, and the fact that he did not do so was a factor in our consideration. See *Second Additional Grand Jury* v. *Cirillo,* 12 N. Y. 2d 206, 210–211; *Vario* v. *County Court, Nassau County,* 32 App. Div. 2d (N. Y.) 1038.

Groups II–V were divided according to subject matter in the following way:

Group II: Baker's involvements with Raymond in June, 1962.

Group III: Baker's involvements with Raymond in September, 1962, particularly with respect to what transpired on September 27 and 28.

Group IV: Baker's alleged relationship with Judges DeSaulnier and Brogna in September, 1962.

Group V: Baker's alleged meeting with Raymond and Judge DeSaulnier at a public place known as the Darbury Room on September 28, 1962.

With respect to (2), we point out that Baker never did ". . . [carve] out an area of refusal" as the witnesses did in cases such as *Yates* v. *United States*, 355 U. S. 66, 71, 73, and *People* v. *Riela*, 7 N. Y. 2d 571, 576–578. It is significant that Baker declined to answer when special counsel asked him: "Are you going to refuse to answer any and all questions I put to you, which questions I represent to you will be confined by their terms to the years 1961 and 1962?" [4] In the *Riela* case, the witness refused to answer any questions before a grand jury pertaining to the "Apalachin meeting." The prosecutor continued to inquire, and the defendant was found guilty of seventeen contempts. In arguing to sustain the convictions on all seventeen, the State relied on the earlier case of *People* v. *Saperstein*, 2 N. Y. 2d 210, wherein the Court of Appeals upheld five convictions of contempt because of a defendant's refusals to "state definitely" who were the participants in five separate telephone conversations. In distinguishing the *Saperstein* case, the *Riela* court stated: "In the present case, the District Attorney necessarily knew, ahead of time, that the claim of privilege once asserted would be repeated, while in *Saperstein* the prosecutor had to continue questioning to find the limits of the defendant's refusal to answer. In *Saperstein*, in other words, the District Attorney was engaged in bona fide interrogation, in the sense that he could reasonably have supposed that the witness would answer each of the questions asked, while here the District Attorney repeated

---

[4] Any testimony which could be argued to have carved out such an area of refusal occurred prior to the stipulation (attached hereto as Exhibit B) and hence is irrelevant.

17 questions knowing full well from Riela's response to his first query that he would not answer any of them." P. 578.

We are careful to point out, however, that we need not decide the question whether a defendant can, by prior announcement, limit his potential number of contempt citations to one. We prefer to await the arrival of such an issue in the normal course of litigation. Suffice it to say that Baker made no effort so to define his area of refusal, and thus cannot come within the possible protection of principle (2).

We recognize that our decision to impose consecutive sentences may be subject to constitutional limits. We consciously attempted to avoid imposing sentences so long in the aggregate as conceivably to violate constitutional limitations. See *Mayberry* v. *Pennsylvania*, 400 U. S. 455, 469 (Harlan, J. concurring); *Second Additional Grand Jury* v. *Cirillo*, 12 N. Y. 2d 206. In this respect the aggregate sentences imposed (with respect to the several groups of questions each relating to a different period of time or to a different group of incidents) are not excessive. The punishment imposed is fully warranted in view of the great importance of this proceeding to the integrity of the judicial system of the Commonwealth, and in view of the seriously obstructive and contumacious action of Baker. He was offered extraordinarily thorough protection from prosecution by the enforceable stipulations of the Commonwealth in addition to the protection afforded by the statute of limitations.

Matter of DeSaulnier (No. 3).

## Exhibit A

| | Trans. Page | Ques. No. | Subject Matter |
|---|---|---|---|
| **Group I.** | | | |
| DISPOSED OF ON 11–29–71 | 1226 | 1 | Q. Now, directing your attention, Mr. Baker, to the year 1961, did you at some time in the fall of that year meet a man named Michael Raymond? |
| | 1229 | 3 | Q. Did there come a time in the fall of 1961 when you wrote a surety bail bond for Michael Raymond with respect to an indictment in the Middlesex Superior Court? |
| | 1229 | 4 | Q. And Mr. Baker, did you in 1961 receive any payment for any bail bond which you wrote or arranged for writing for Michael Raymond? |
| | 1230 | 5 | Q. Did you, in 1962, in May or June of that year, have any communication with Michael Raymond? |
| | 1231 | 6 | Q. Mr. Baker, on May 29th, 1962, did Mr. Michael Raymond — did you say to Mr. Michael Raymond in your office, "You have finally come to the right place," or words in substance similar thereto? |
| | 1232 | 7 | Q. [By Mr. Harrington] At any time in 1962, Mr. Baker, did you receive from Michael Raymond any money? |
| | 1232 | 8 | Q. Did you in May or June of 1962, Mr. Baker, tell Mr. Raymond that for a payment of $10,000 you would arrange a continuance of a case then pending against him in the Middlesex Superior Court? |
| | 1233 | 9 | Q. Mr. Baker, in June of 1962, did you provide a surety bail bond for Mr. Michael Raymond in the sum of $20,000 in the Ayer District Court, otherwise known as the First District Court of Northern Middlesex? |

Matter of DeSaulnier (No. 3).

| | TRANS. PAGE | QUES. No. | SUBJECT MATTER |
|---|---|---|---|
| GROUP I. | | | |
| | 1233 | 10 | Q. Mr. Baker, did you in June of 1962 receive as payment of a premium for a bail bond of Michael Raymond in the First District Court of Northern Middlesex the sum of $1,000 in cash? |
| | 1234 | 11 | Q. Mr. Baker, were you in June, 1962, acquainted with a lawyer practicing in the City of Worcester, Massachusetts, named "Richard G. Crotty?" |
| | 1235 | 12 | Q. Did you in June, 1962, Mr. Baker, mention the name of Richard G. Crotty to Michael Raymond? |
| | 1242 | 22 | Q. Did you, Mr. Baker, between May and September of 1962 have any part in Mr. Raymond securing the services of Richard G. Crotty of Worcester as an attorney? |
| GROUP II. | | | |
| DISPOSED OF ON 12–1–71 | 1235 | 13 | Q. Did you in June of 1962, Mr. Baker, own an automobile of the type known as a Thunderbird? |
| | 1236 | 14 | Q. Mr. Baker, in June of 1962, did you drive Mr. Michael Raymond to Worcester, Massachusetts, to the office of Richard G. Crotty? |
| GROUP III. | | | |
| DISPOSED OF ON 12–1–71 | 1238 | 16 | Q. In September of 1962, did you have any telephone communication whatsoever with Michael Raymond? |
| | 1238 | 17 | Q. Between June 1962 and September, 1962, had Mr. Michael Raymond of New York been in your office in Boston at any time when you were there? |
| | 1241 | 21 | Q. At any time between May and September of 1962, Mr. Baker, had you had any discussion whatsoever with Mr. Michael Raymond about the |

Matter of DeSaulnier (No. 3).

| Trans. Page | Ques. No. | Subject Matter |
|---|---|---|
| | | |

**Group III.**

|  |  |  |
|---|---|---|
| | | criminal case in Middlesex County in which you had arranged to provide a surety bail bond, that case being No. 57940? |
| DISPOSED OF ON 12–1–71   1243 | 23 | Q. Did you in September of 1962 telephone Mr. Raymond in New York and tell him, in substance, that he had to come to Boston quickly, that a judge had died, and it would be important to dispose of his case during the month of September? |
| 1243 | 24 | Q. Did you at any time in the month of September, 1962, receive any payment by means of currency, check or otherwise, from Mr. Michael Raymond? |
| 1244 | 25 | Q. Mr. Baker, did you go to Middlesex Superior Courthouse on September 27, 1962? |
| 1245 | 26 | Q. Mr. Baker, on September 27, 1962, did you go to the Middlesex County Courthouse in the company of Mr. Michael Raymond? |
| 1246 | 28 | Q. Did you on September 27, 1962, have any conversation with Mr. Michael Raymond? |
| 1247 | 29 | Q. Did you have any conversation on September 27, 1962, with Mr. Raymond with respect to the continuance of either of the cases then pending against him — him, Mr. Raymond — being No. 57940 and No. 65677? |
| 1249 | 30 | Q. Directing your attention to September 28, 1962, Mr. Baker, did Mr. Raymond come to your office before court on that day? |
| 1249 | 31 | Q. Directing your attention to September 28th, 1962, did you accompany Mr. Michael Raymond to the Middlesex Superior Court on that day? |

Matter of DeSaulnier (No. 3).

| | Trans. Page | Ques. No. | Subject Matter |
|---|---|---|---|
| **Group. III** | | | |
| DISPOSED OF ON 12–1–71 | 1250 | 32 | Q. Were you in the company of Mr. Michael Raymond on September 28, following the close of court in the Middlesex Superior Court? |
| **Group IV.** | | | |
| DISPOSED OF ON 12–1–71 | 1239 | 18 | Q. In September of 1962, Mr. Baker, did you know Mr. Justice DeSaulnier of the Superior Court of Massachusetts? |
| | 1240 | 19 | Q. As of September of 1962, Mr. Baker, had you ever met Mr. Justice DeSaulnier? |
| | 1240 | 20 | Q. As of September, 1962, had you ever met Mr. Justice Brogna of the Massachusetts Superior Court? |
| | 1245 | 27 | Q. Mr. Baker, did you on September 27, 1962, telephone Mr. Justice DeSaulnier from the Middlesex County Courthouse? |
| | 1254 | 37 | Q. At any time in 1962 Mr. Baker, did you communicate with Mr. Justice DeSaulnier with respect to the conduct or disposition of the case or cases against Mr. Michael Raymond then pending in the Middlesex Superior Court? |
| | 1255 | 39 | Q. In 1962, Mr. Baker, did you communicate with Mr. Justice Brogna in connection with the conduct or disposition of the cases then in 1962 pending against Michael Raymond in the Middlesex Superior Court? |
| **Group V.** | | | |
| DISPOSED OF ON 12–1–71 | 1251 | 33 | Q. On September 28, 1962, Mr. Baker, had you ever been in the Darbury Room, a bar and restaurant in Boston on Dartmouth Street? |

Matter of Desaulnier (No. 3).

| | Trans. Page | Ques. No. | Subject Matter |
|---|---|---|---|
| Group V. | | | |
| DISPOSED OF ON 12–1–71 | 1251 | 34 | Q. On September 28, 1962, Mr. Baker, did you go to the Darbury Room in Boston, Mass., in the company of Michael Raymond? |
| | 1252 | 35 | Q. On September 28, 1962, did you meet Mr. Justice DeSaulnier in the Darbury Room in Boston? |

EXHIBIT B

## COMMONWEALTH'S STIPULATION

The Commonwealth will not prosecute any indictment returned against I. Charles Baker charging conspiracy or larceny* prior to January 1, 1965.

In prosecuting any indictment charging conspiracy or larceny* subsequent to January 1, 1965, the Commonwealth will not introduce as evidence any conduct or statements of I. Charles Baker engaged in or made prior to that date.

The Commonwealth will not introduce in any criminal proceeding any testimony given by I. Charles Baker before the Supreme Judicial Court.

> For the Commonwealth,
> John J. Droney
> District Attorney
>
> By,    Richard A. Gargiulo
>        First Assistant District Attorney

[Assented to in behalf
of the Attorney General]

[*Underlined words in effect added by stipulation in open court November 24, 1971, Tr. 1197–1198]

Reporter's Note. In open court on November 29, 1971, after the findings, rulings, and order were made, the above stipulation was amplified by adding at the end of the sentence the following:

> or any facts learned as a consequence of such testimony, except in any prosecution for perjury based upon testimony by I. Charles Baker before the Supreme Judicial Court in this proceeding. The Commonwealth will not prosecute I. Charles Baker for perjury, if any, committed in his sworn testimony before Chief Justice McLaughlin of the Superior Court on August 25, 1971.