**UNITED STATES of America ex rel. Clifford SMITH, Petitioner-Appellant,**

v.

**M. J. PAVICH, Supervisor, Peoria Work Release Center, and the Illinois Attorney General, Respondents-Appellees.**

**No. 77-1408.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 2, 1977.

Decided Jan. 4, 1978.

Richard J. Hoskins, Chicago, Ill., for petitioner-appellant.

Gerri Papushkewych, Asst. Atty. Gen., Springfield, Ill., for respondents-appellees.

Before SPRECHER and TONE, Circuit Judges, and GRANT, Senior District Judge.*

SPRECHER, Circuit Judge.

When a defendant is accorded his Sixth and Fourteenth Amendments' right to self-representation, may he thereafter complain that the quality of his own defense amounted to a denial of "effective assistance of counsel?"

I

The defendant [1] was indicted by an Illinois grand jury on July 13, 1973, for intimidation in violation of Ill.Rev.Stat. ch. 38, § 12–6, and for communicating with a witness in violation of Ill.Rev.Stat. ch. 38,

§ 32–4, by reason of having threatened to kill Joseph Scherff should he testify against the defendant in another pending criminal case. This case was tried before a jury with the defendant acting as his own attorney. On October 19, 1973, the jury was unable to reach a verdict and a mistrial was declared.

On February 11, 1974, the state judge advised the defendant that the Public Defender of Peoria County had been appointed to represent him and asked the defendant if he wanted such representation. The defendant responded, "No, your Honor, I am representing myself. I represented myself in the preceding trial, which was a mistrial and I represent myself."

The following then took place:

The Court: You have, of course, a statutory and constitutional right to appear in Court and to represent yourself as your own Counsel, but the Court, also, has a duty to and, I think, a privilege, perhaps, of having an officer of the Court sitting at your elbow to advise you from time to time on things that you might ask that would be appropriate. Now, I have had an opportunity, since this case was assigned to me last week, to sit down and to read the entire transcript of testimony that you now have. You were still in the hospital until Thursday and I read it Wednesday night. My observation would be that as a layman untrained in the law you did a better than average job of representing yourself in that trial, but in comparison with an Attorney, you did a very poor job representing yourself. In other words, I felt that probably you put in 30 to 40 percent of the evidence that was bad for you in that trial, if I may express it that way. You did many things that young lawyers just out of law school do that we consider mistakes, you see, and if you had a competent lawyer sitting at your elbow saying, "Mr. Smith, stay away from that area, you are killing

---

* Senior District Judge Robert A. Grant, of the Northern District of Indiana, is sitting by designation.

1. Although Clifford Smith is the petitioner-appellant in this court, he is referred to in this opinion as the defendant for simplification.

yourself", you are going to come out better, even if you try the case yourself. He doesn't have to say a word to the Jury nor ask a single question of a witness. I would like to have someone there counselling you while you try your own case. I think I have a right to have a friend of the Court with whom I can deal, someone with a legal education. I have gone kind of through a telephone directory list of Attorneys in Peoria County that I know have had experience in representing Defendants in felony cases. These are not primarily the key attorneys that handle the bulk of our defense cases in Peoria County, because they are so darned busy I couldn't get them in here on short notice to handle the case. If you want one of them we would have to put your trial over until a future time. I am not saying you can't have any lawyer you want, but I have simply prepared a list and if you would like to have me just go through the list until I can find someone who would at least sit at your side, here, at the Counsel table and advise you, you are going to be better off, I'm going to be better off and the trial will go much more smoothly and give this lawyer a chance to read this previous record and, then, point out to you, "Mr. Smith, you shouldn't have asked that question." I'm going to ask the State's Attorney, here, to give you this list and you look at it. If there is anyone you know that you don't want, cross it off. If there is anyone that you know that you could get along with, fine, we will see if we can get him over here on a rather short day to assist you.

A: Your Honor, I would invoke my constitutional right to defend myself without the assistance of any Counsel. It would take too long for them to get into the true background of this case and I feel, in fact, I know that there would be certain points that they would overlook. Now, I have had quite a bit of study in law. I stopped studying law 12 years ago, but as far as the last trial goes, what I brought out that some people thought would be prejudicial, immaterial to the issues, that was part of my strategy and

it will be quite different this time, because I know what to bring out, now, and what will be irrelevant, what will be material to the issues and I could actually say, your Honor, that this trial wouldn't last over a half hour if all the witnesses weren't brought in here to testify, but the State is going to bring in witnesses and I have to contradict and rebut anything that he does, here.

The Court: I understand.

A: But I think that I'm versed enough in the law to defend myself.

The Court: Well, I am not challenging the point, but what you can try your own case, but the Court, I think, has a right to have an officer of the Court sitting at the Counsel table with whom he can communicate on technical problems and let him translate that to you in a way that you can understand it. I would like to have you take that list and if there are any there that you know that you don't want any part of in the Courtroom, just mark it out.

A: Like I say, your Honor, I really don't want anyone sitting with me.

The Court: You understand, do you, what you are charged with here, that it is a felony?

A: Yes, your Honor, I do.

The Court: And you understand that the nature of the charge is one of interfering with or attempting to intimidate a witness who would possibly appear and testify against you at another trial?

A: Yes, your Honor.

The Court: And you understand that this is a serious offense and it is a matter for which there could be a penitentiary or fine punishment in the event you were found guilty?

A: Yes, your Honor.

The Court: How much high school or college education did you have?

A: Well, your Honor, I am credited formally with two years of high school and, actually, I have also been credited with two years of college, that is by intelligence tests at various times.

The Court: What was your employment experience?

A: My employment experience was mostly machine operator, Caterpillar Tractor and other companies.

The Court: Did you take any special courses to become a machine operator, were you an apprentice?

A: I took a short course at Farmall, I operated some straight lathing, milling and center machines, I have operated boramatic machines for Caterpillar, I have taken their tests.

The Court: All right. You have no particular training in law, except your own study, is that correct?

A: Yes, that's—I have had training in commercial law, typing, shorthand.

The Court: Where did you get that training?

A: I received that in the penitentiary, I have taken courses in welding. I have also worked as a welder.

The Court: O.K.

A: Also, radio blueprint reading.

The Court: At the outset and having read the record of the previous hearing, I will say that, as I say, as a layman you did a better than average job of representing yourself, but you didn't do as good a job as an Attorney and, again, would admonish you to at least have someone sitting at your elbow who need not take any part in trial except to advise you. Are you willing to accept this?

A: No, your Honor, as I say, I am more familiar with my case than any Attorney would be and it would take him too long.

The Court: I am thinking of the technical evidence problems, rather than doing anything else. All right. Are you now suffering from any kind of physical disability that would impair your ability to stand a three day trial, here, and represent yourself? I know that you were in the hospital last week, I heard that it had something to do with your heart. Now, what could you tell me something about that experience, what has been your physical condition and your physical experience over the last several weeks or months?

A: Well, I have had, you might say a mild heart attack two or three times, but that's something that I have had since 1968. With that condition I'm subject to dying at any time.

The Court: All right, now, do you feel, in your opinion, that you are physically able to withstand the tensions and problems involved in sitting through a trial and conducting the trial yourself in your own behalf at this time?

A: Yes, your Honor, I have done so before.

The Court: I understand, but you didn't just get out of the hospital before, but I'm asking now.

A: Yes, I had, your Honor.

The Court: Is the nature of your heart problem a coronary insufficiency, that is, the blood is not adequately circulating through your veins, what do you know of the nature of your heart problem, sir?

A: Yes, it is a deterioration of the heart, left side of the muscle, it is getting sufficient circulation, now, through medication.

The Court: Are you taking medication for it at the present time?

A: Yes, I have since 1968.

The Court: Now, you were under the care of a physician, I assume, last week when you were at the hospital?

A: Yes, your Honor.

The Court: Do you want me to get a written medical report from that doctor certified that in his professional opinion that you are physically able to stand trial?

A: No, your Honor, because he would not have returned me to the County Jail if he thought I wasn't physically able and he has made that statement before, and I do have a medical record where he has stated that before.

The Court: All right, now, returning to the County Jail for rest is a lot different than coming into Court and defending yourself in a felony suit, you understand that?

A: I understand, but I have more tension—

The Court: Do you want me to contact the doctor and find out from him if, in his opinion, you could withstand the strain of a trial? I don't want to do anything that is going to jeopardize your physical health.

A: No, your Honor, I think I can withstand the tension of the trial, there is more tension in the County Jail than there is in the trial.

The Court: I will have to take your word for it, I have never been there except as a visitor. Are you suffering from any nervous or mental disorder at the present time, that you know of?

A: No, your Honor, and I would say that I have been examined by the foremost psychiatrist in the United States, Mr. John Goldsborough, and that he is a Neurosurgeon and a psychiatrist and I have no mental abnormality, no psychosis of any kind and my intelligence tests have been of high average. My Army intelligence tests have been very superior and they are to this day. I have records here to that effect.

The Court: O.K. Now, in light of all that I have said today and admonished you and we have discussed, I would still ask you, is it your desire to represent yourself in this case in a Jury trial?

A: Yes, your Honor, I invoke my right.

The Court: Has there been any threats or coercion or compulsion of any kind by anyone to get you to waive your right to an Attorney?

A: No, your Honor.

The Court: It is strictly your own free will and volition?

A: It is my own volition.

On the same day that the above discussion took place a jury was selected for the second trial, which took place on February 12 and 13, 1974. The defendant again represented himself but this time the jury found him guilty on both charges. The state judge sentenced the defendant for a term of not less than three nor more than ten years upon the greater offense of intimidation, following post-trial motions and a sentencing hearing at which the defendant was represented by court-appointed counsel.

Upon appeal to the Illinois Appellate Court, where the defendant was represented by court-appointed counsel, the court affirmed the judgment and sentence as to intimidation but reversed the judgment as to communicating with a witness, upon which no sentence had been imposed. *People v. Smith,* 33 Ill.App.3d 725, 338 N.E.2d 207 (1975).

On October 12, 1976, the defendant filed his *pro se* petition for writ of habeas corpus in the Southern District of Illinois, where it was denied by a decision and order entered on February 9, 1977. Through court-appointed counsel he has appealed, raising the issue of whether he was denied his constitutional right to the effective assistance of counsel and due process by (1) his claimed inadequate attempt to waive counsel, (2) his claimed inability to represent himself, and (3) the alleged failure of the trial court to intervene in the interests of justice and a fair trial.

## II

The interrogation of the defendant by the state trial judge and the defendant's responses are reproduced in their virtual entirety in Part I inasmuch as they are substantially parallel to Faretta's responses in *Faretta v. California,* 422 U.S. 806, 807, 835–36, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975):

> Questioning by the judge revealed that Faretta had once represented himself in a criminal prosecution, that he had a high school education and that he did not want to be represented by the public defender
>
> . . .
>
> \* \* \* \* \* \*
>
> . . . Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free

will. The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, and that Faretta would be required to follow all the "ground rules" of trial procedure. Here, the state trial judge went a step further and tried to persuade the defendant to accept a "standby counsel" as suggested in *Faretta,* 422 U.S. at 835, note 46, 95 S.Ct. 2525. The defendant responded that "I would invoke my constitutional right to defend myself without the assistance of any Counsel" and again, "Like I say, your Honor, I really don't want anyone sitting with me." The defendant here could also point to the earlier mistrial, where he represented himself. Defense counsel ordinarily consider it an achievement to win a hung jury. Finally, as the Supreme Court said in *Faretta,* the defendant's "technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself." 422 U.S. at 836, 95 S.Ct. at 2541.

■ In view of the state judge's lengthy interrogation and the defendant's firm and repeated responses that he wished to represent himself, that he desired no legal assistance, and that he definitely eschewed even standby counsel, we must conclude that the defendant knowingly and intelligently waived counsel.

### III

Once this barrier of competent and knowing waiver has been hurdled there is grave doubt whether the self-represented defendant can raise any further questions, such as the quality of his representation or the failure of the judge to intervene. *Faretta* itself gives a rather quick reply:

Thus, whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own

defense amounted to a denial of "effective assistance of counsel."

422 U.S. at 835, n. 46, 95 S.Ct. at 2541.

It may be questioned, however, whether the facts of *Faretta* permitted a dispositive and final answer to the problem inasmuch as the Court only decided that a defendant had a constitutional right to self-representation. Nevertheless, the same broad approach was taken in *Johnson v. Zerbst,* 304 U.S. 458, 465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), where the essential finding was the requirement that waiver of the right to the assistance of counsel be "intelligent and competent." There the Court added:

Since the Sixth Amendment constitutionally entitles one charged with crime to the assistance of counsel, compliance with this constitutional mandate is an essential jurisdictional prerequisite to the federal court's authority to deprive an accused of his life or liberty. When this right is properly waived, the assistance of counsel is no longer a necessary element of the court's jurisdiction to proceed to conviction and sentence.

304 U.S. at 467–68, 58 S.Ct. at 1024.

Therefore, although *Johnson v. Zerbst* mandated that "[t]he determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused," that case appears to sanction ending the inquiry once the waiver is determined to exist. *Id.* at 464, 58 S.Ct. at 1023.

Prior to *Faretta* many of the United States Courts of Appeals held that the right of self-representation was protected by the Bill of Rights.[2] Since the Judiciary Act of 1789, persons in federal courts have had the statutory right to "conduct their own cases personally."[3] Courts interpreting the constitutional or statutory right appear agreed

---

**2.** *Faretta v. California,* 422 U.S. 806, 816–17, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

**3.** 28 U.S.C. § 1654: "In all courts of the United States the parties may plead and conduct their

own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."

that once the defendant voluntarily and intelligently waives the right to assistance of counsel, "he will not later be heard to complain that his Sixth Amendment rights have been impaired." *Watts v. United States,* 273 F.2d 10, 12 (9th Cir.), *cert. denied,* 362 U.S. 982, 80 S.Ct. 1069, 4 L.Ed.2d 1017 (1960).[4]

In other contexts the Supreme Court has strongly condemned the idea that a trial is a "sporting event," with a "poker game" approach where gamesmanship is at a premium. *Williams v. Florida,* 399 U.S. 78, 82, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1969). *See also,* Brennan, *The Criminal Prosecution: Sporting Event or Quest for the Truth?* 1963 Wash.U.L.Q. 279, 292. The opportunity for a defendant to engage in gamesmanship has greatly increased in recent years with the standard for effective representation having been raised in many circuits.

Most courts have rejected the old "farce and mockery" standard and have supplanted it with a higher standard. In this circuit, "[t]he criminal defendant, whether represented by his chosen counsel, or a public agency, or a court-appointed lawyer, has the constitutional right to an advocate whose performance meets a minimum professional standard." *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 640 (7th Cir. 1975). The new, higher standards adopted by the several circuits are summarized in *Rickenbacker v. Warden,* 550 F.2d 62, 66 (2d Cir. 1976). Obviously, such standards cannot be applied to test the quality of the self-representative.

In *Mayberry v. Pennsylvania,* 400 U.S. 455, 462, 91 S.Ct. 499, 503, 27 L.Ed.2d 532 (1971), Mr. Justice Douglas noted that "[l]aymen, foolishly trying to defend themselves, may understandably create awkward and embarrassing scenes." In the present case, the state trial judge went to the extent of reading the entire transcript of the defendant's first trial and told the defendant that he had done "a very poor job

representing yourself" even though "you did a better than average job of representing yourself in that trial." In other words, the defendant was told as frankly as possible that the best layman is likely to try a case more ineptly than the worst lawyer. The defendant's response was "what I brought out that some people thought would be prejudicial, immaterial to the issues, that was part of my strategy . . .."

The Chief Justice, dissenting in *Faretta,* said that "[t]he fact of the matter is that in all but an extraordinarily small number of cases an accused will lose whatever defense he may have if he undertakes to conduct the trial himself." 422 U.S. at 838, 95 S.Ct. at 2543. Mr. Justice Blackmun dissenting added that "[t]he procedural problems spawned by an absolute right to self-representation will far outweigh whatever tactical advantage the defendant may feel he has gained by electing to represent himself." *Id.* at 852, 95 S.Ct. at 2550.

Given the absolute right of self-representation of *Faretta,* a residual right to insist upon a certain quality of that representation would result in unbearable appellate burdens, if not chaos. It would encourage every defendant to undertake his own defense for the manifold advantages it would give him: first, by appearing before the jury relatively undefended he would tend to gain the jury's sympathy; failing in that he could deliberately introduce confusion and hope that chance would work its way in his favor; and finally, if all else failed, he could seek review on the basis of his inept representation. He would have three different days in court at a minimum.

■ The defendant here on appeal now asserts that his inability to defend himself placed a duty upon the trial judge to intervene and, in effect, to carry on the defense. We agree with the court in *United States v. Trapnell,* 512 F.2d 10, 12 (9th Cir. 1975), decided before *Faretta,* which said:

---

4. Judge East said in *United States v. Dujanovic,* 486 F.2d 182, 186 (9th Cir. 1973):

> Nothing whatsoever can thereafter occur during the pilotless journey which will evi-

> dence the state of mind of the accused or information at hand upon which he at that time intelligently waived his constitutional right of counsel.

While the trial judge has a broad discretion with respect to his interrogation of witnesses, he must always be sensitive to his role as judge and the fact that in the eyes of the jury he "occupies a position of preeminence and special persuasiveness" and accordingly "be assiduous in performing his function as governor of the trial dispassionately, fairly and impartially". *United States v. Cassiagnol,* 420 F.2d 868, 879 (4 Cir. 1970), cert. denied, 397 U.S. 1044, 90 S.Ct. 1364, 25 L.Ed.2d 654, citing *Pollard v. Fennell,* 400 F.2d 421, 424 (4 Cir. 1968).

For the trial judge to assume the responsibility of examining witnesses for either party would change the judicial role from one of impartiality to one of advocacy. The fact that a defendant represents himself does not alter the judicial role nor does it impose any new obligation on the trial judge. The defendant under those circumstances must assume the responsibility for his inability to elicit testimony. As stated by this court in *United States v. Dujanovic, supra,* 486 F.2d at 188, " . . . one of the penalties of the appellant's self-representation is that he is bound by his own acts and conduct and held to his record". A defendant representing himself cannot be heard to complain that his Sixth Amendment rights have been violated.

Footnote 46 of *Faretta* reinforces our conclusion that a defendant who knowingly and intelligently waives his right to counsel cannot complain that his self-representation was ineffective. *Faretta v. California,* 422 U.S. 806, 834–35, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

Nevertheless, we have examined the transcript of defendant's second trial. As the Illinois Appellate Court found, the defendant created no disruptive scenes and the trial was orderly. 338 N.E.2d at 208.

As the prosecution pointed out, the trial judge assisted the defendant in the proper technique to lay a foundation for a prior statement (Tr. at 68); to impeach a prior statement (Tr. at 70); and to introduce a document into evidence (Tr. at 80). The trial court also attempted to advise the defendant outside the hearing of the jury to avoid eliciting damaging evidence (Tr. at 79–80). Before the jury the court attempted to limit by his rulings the defendant's repeated attempts to relitigate his former conviction (Tr. 123), which attempts were obviously damaging to the defendant. The transcript also reveals that the defendant thoroughly examined each witness, although his questions were not necessarily the ones a skilled practitioner might ask.[5]

For these reasons the judgment of February 9, 1977, denying the defendant's petition for a writ of habeas corpus is affirmed.

AFFIRMED.

5. Unfortunately, we are advised by defendant's counsel on appeal that the record does not include the trial court's instructions to the jury in the second trial. The record includes a set of given instructions but presumably these were given at the first trial resulting in the hung jury. When the defendant represents himself, the trial judge ordinarily cannot expect much assistance from defense-tendered instructions in framing his charges; but, since the ultimate responsibility for a fair charge remains with the judge, he must exercise special care in his charge to protect the defendant's rights.